# Illinois Official Reports

## Appellate Court

***People v. Whitfield*, 2017 IL App (2d) 140878**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HEZEKIAH D. WHITFIELD, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0878 |
| Filed | March 3, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 12-CF-1269; the Hon. Mark L. Levitt, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and Kerry Goettsch, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Lawrence M. Bauer, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Presiding Justice Hudson and Justice Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1     In this direct appeal from his conviction of first degree murder, the defendant, Hezekiah Whitfield, raises three arguments: (1) the trial court should have suppressed his unrecorded custodial statement to police pursuant to section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2010)), which renders such statements presumptively inadmissible in a murder trial; (2) the trial court erred in limiting his ability to present evidence of other crimes committed by someone else who had been convicted of the same murder (a conviction that was later overturned); and (3) the trial court should have allowed him to present evidence explaining his travel to Indonesia shortly after the police obtained a DNA sample from him. Although we agree with certain of these arguments, we affirm on the basis that the trial court's errors were harmless in light of the compelling DNA evidence against the defendant.

## I. BACKGROUND

¶ 2

¶ 3     On December 9, 1994, Fred Reckling was found dead in a Grand Appliance store in Waukegan. His head had been beaten in. Four small droplet-type stains were found on the carpet near the door. Pieces of the carpet containing the stains were removed and sent for testing. Reckling's car was recovered 10 days later in Chicago; there were stains on the driver's seat, the steering wheel, and the threshold between the door and the driver's seat. Later testing showed that all of the stains on the carpet pieces and the car were blood.

¶ 4     A little over a year later, James Edwards, who had been arrested for a series of robberies in the Waukegan area, told Waukegan police that he had murdered Reckling. He was convicted of the murder in 1996. However, in 2010, the supreme court granted Edwards's request for DNA testing of the blood evidence in the case. The DNA from the bloodstains did not match either Reckling's or Edwards's DNA. Edwards was subsequently cleared of the charges relating to Reckling's death.

¶ 5     The DNA test ordered by the supreme court took place in May 2011. A comparison of this DNA with the CODIS DNA database indicated a probable match with the defendant. On June 24, 2011, the Waukegan police pulled over the truck that the defendant was driving. Shamiya Mathis, a woman whom the defendant had begun dating a few months earlier, was with him. The police took the defendant to a hospital and obtained a DNA sample from him. They then released him.

¶ 6     On April 13 of the following year, the Chicago police issued a warrant for the defendant's arrest in connection with an assault on a woman named Ebony, who appears to have been known to Mathis. Four days later, on April 17, 2012, the Chicago police department received a report of an assault involving the defendant and Mathis. Two patrol officers, Christopher Erickson and his partner, Jacquelyn Spaargaren, responded. They found the defendant outside in an alley with a wound to his head. He told them that Mathis had struck him in the head with something heavy. Both he and Mathis were transported to the police station (the defendant was taken first to a hospital for examination). The police questioned both Mathis and the defendant. The circumstances of that questioning are disputed, and we will address them in depth later in this opinion. Mathis and the defendant were then released.

¶ 7         On May 2, 2012, the defendant was indicted for the murder of Reckling. He was arrested on that charge on May 15, 2012. Trial was eventually set to start on April 21, 2014.

¶ 8                    A. Motion *in Limine* to Bar Evidence of Defendant's Statement
¶ 9         In January 2014, the defendant filed a motion *in limine* seeking to bar the State from introducing any evidence regarding the defendant's statement while in police custody on April 17, 2012. His motion was based on section 103-2.1 of the Code (recording statute), which provided as follows:

> "When statements by accused may be used.
>
> (a) In this Section, 'custodial interrogation' means any interrogation during which (i) a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response.
>
> In this Section, 'place of detention' means a building or a police station that is a place of operation for a municipal police department or county sheriff department or other law enforcement agency, not a courthouse, that is owned or operated by a law enforcement agency at which persons are or may be held in detention in connection with criminal charges against those persons.
>
> In this Section, 'electronic recording' includes motion picture, audiotape, or videotape, or digital recording.
>
> (b) An oral, written, or sign language statement of an accused made as a result of a custodial interrogation at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused in any criminal [homicide] proceeding *** unless:
>
> (1) an electronic recording is made of the custodial interrogation; and
>
> (2) the recording is substantially accurate and not intentionally altered.
>
> * * *
>
> (e) Nothing in this Section precludes the admission *** (ii) of a statement made during a custodial interrogation that was not recorded as required by this Section, because electronic recording was not feasible, *** (viii) of a statement given at a time when the interrogators are unaware that a death has in fact occurred, or (ix) of any other statement that may be admissible under law. The State shall bear the burden of proving, by a preponderance of the evidence, that one of the exceptions described in this subsection (e) is applicable. Nothing in this Section precludes the admission of a statement, otherwise inadmissible under this Section, that is used only for impeachment and not as substantive evidence.
>
> (f) The presumption of inadmissibility of a statement made by a suspect at a custodial interrogation at a police station or other place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." *Id.*

The defendant argued that, under the recording statute, his statement to police on April 17, 2012, was inadmissible in any murder trial against him because it was the result of custodial interrogation at a police station and it had not been electronically recorded. The State did not file any written response to the motion.

- 3 -

¶ 10 The hearing on the motion commenced on March 27, 2014, and stretched over portions of four days. The State presented three witnesses, all of them Chicago police officers: Erickson, Spaargaren, and Juan Cardenas. Before testifying, all of the officers had reviewed Spaargaren's written report regarding her conversation with the defendant on April 17, 2012.

¶ 11 Erickson testified that he had been patrolling with Spaargaren at about 8:15 p.m. on the evening of April 17, 2012, when they received a call regarding a domestic battery. He and Spaargaren responded to the call. Cardenas and his partner also responded, arriving a few minutes later.

¶ 12 Erickson found the defendant walking in an alley with a laceration on his head and blood on his shirt. The defendant said that he had been hit in the head with a blunt object, and he identified two women (Mathis and another woman) as having been involved. There was no odor of alcohol on the defendant's breath and, except for some agitation due to the assault, he was calm. Cardenas took the defendant to a hospital to have his injuries examined, per police protocol. Erickson and Spaargaren took Mathis to the police station.

¶ 13 Just before 9 p.m., the defendant was brought to the police station. Erickson described the defendant's manner as "normal, a little bit agitated," because he was "in a police station with the injuries still to his head." The defendant was brought to the rear processing room, where he was chained to a bench along one wall. (Mathis was not in that room at that point.) The room was about 12 feet by 20 feet, with four desks and computers, and a holding cell that was about 8 feet by 8 feet. There was no video recording equipment in that room. Erickson believed that there was "video in the back lock up area where offenders [were] fingerprinted" but not in any of the rooms where offenders were processed.

¶ 14 Erickson sat at a desk and began entering an incident report regarding the assault upon the defendant by Mathis. Spaargaren began questioning the defendant. She was sitting near Erickson, "no more than five feet approximately" away from him. Erickson did not read the defendant his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and he did not hear any other police officer do that. Spaargaren did not say anything to Erickson about the defendant being a suspect in a murder investigation.

¶ 15 In response to a question about when the defendant had last encountered the police, Erickson heard him say something to the effect of "I was recently stopped by Waukegan" and "something about DNA." The defendant then said, "My lawyer said don't talk about anything." Erickson did not hear the defendant say anything else. Erickson specifically denied hearing the defendant say anything about leaving for Indonesia after being DNA tested, when "they" were going to "find out that I did it," or about being "safe because another guy [was] doing the time." Asked whether Erickson heard the entire conversation between Spaargaren and the defendant that Spaargaren described in her written report, Erickson said that he did not; he heard only the statement that he had described regarding the defendant being stopped by the Waukegan police and his lawyer telling him not to talk about it.

¶ 16 Cardenas testified next. He and his partner also responded to the domestic battery call on the evening of April 17, 2012, arriving after Erickson and Spaargaren. The defendant had a laceration on his forehead and one on his hand; Cardenas believed that the latter was the source of the blood on his shirt. Cardenas spoke with the defendant to see if he needed medical assistance. The defendant's responses were coherent, his demeanor was calm, and there was no indication that he was under the influence of any alcohol or controlled substance. He did not complain of being in pain. In fact, the defendant declined to go to the hospital, but Cardenas

and his partner took him there anyway because police procedure required a medical evaluation or a written refusal of medical service. At the hospital, he was observed by a doctor, who signed off on the defendant's refusal of medical treatment.

¶ 17    Cardenas then brought the defendant to the police station's processing room. Cardenas described the room as about 15 by 20 feet, with four computers and two benches. Erickson and Spaargaren were in the room. Cardenas had not Mirandized the defendant. When he did Mirandize suspects, he used preprinted forms that were provided to the officers. The defendant was handcuffed to a bench. He remained conscious and did not complain of any pain or request water, food, or to go to the bathroom.

¶ 18    Cardenas and his partner remained in the processing room for the next 10 to 15 minutes, waiting to see if Erickson and Spaargaren needed them for anything else. Erickson was entering a report into the computer and Cardenas was standing behind him. Spaargaren and the defendant were seven to eight feet away, having a conversation. Cardenas saw them talking but did not hear them. Cardenas thought Spaargaren and the defendant spoke for three to five minutes.

¶ 19    Spaargaren testified that, when she responded to the domestic battery call on April 17, 2012, she saw Mathis and the defendant arguing in the alley behind Avenue M. She and Erickson separated them. Both Mathis and the defendant claimed to have been the victim of assault. The defendant was taken to the hospital. In the squad car, Mathis told Spaargaren that the defendant was named as the perpetrator of an assault committed four days earlier, on April 13, 2012. Spaargaren said that she would look into that when they got to the police station. Mathis also said that the defendant was wanted for a murder investigation in Waukegan. She said that someone else was serving time for the murder, but the defendant was still wanted in connection with the case.

¶ 20    When they got to the police station, Spaargaren looked up the defendant and found that he had indeed been named as the perpetrator of a battery to a woman named Ebony four days earlier. However, she found no record of a warrant or stop order or anything else indicating that the defendant was wanted by police in connection with a murder.

¶ 21    Soon afterward, the defendant came into the processing room at the police station and was handcuffed to a bench in the room. Spaargaren described the processing room as "13 by 12 or 14 by 14" with two computers in it. As she recalled, the only other officers in the room were Erickson and Cardenas. She sat across from the defendant and had a conversation with him. She estimated that she was about three feet away from him.

¶ 22    As she knew that he had been accused of an earlier battery, she Mirandized him. She did this "off the top of [her] head," telling him that he had the right to remain silent, that anything he said could and would be used against him in a court of law, and that if he could not afford an attorney one would be appointed for him. (Upon being asked, Spaargaren said that she had also told him that he had the right to have an attorney present.) She then asked him if he understood, and he said yes.

¶ 23    According to Spaargaren's testimony, her interrogation of the defendant was as follows:

"A. [Spaargaren:] I said I had gotten some information you are wanted in a murder case in Waukegan. He said, 'What?' I said, 'Yes, you are wanted in a murder investigation in Waukegan.' He said 'I was DNA tested for that, and when they were

going to find out I did it, I fled to Indonesia. They can't do anything to me anymore. Someone else is serving time for that.'

Q. [State's Attorney:] After he made that statement to you, what did you say to him?

A. I said 'Were you there at the scene? Do you know the person that is serving time? How are you involved?' He said 'I don't want to talk about this anymore.' "

Spaargaren said that she then stopped questioning the defendant.

¶ 24 On cross-examination, Spaargaren testified that she had not had the defendant sign a statement of his *Miranda* rights; she just recited them verbally based on her 21 years of police experience. In her written report of her interrogation of the defendant, she did not mention the other questions she had asked him because she recorded only what he said, "not anything that he did not say."

¶ 25 The defendant was the final witness at the hearing. As to the events that occurred before the police arrived at the scene on April 17, 2012, he said that Mathis had tried to stab him and had hit him in the head with a pipe. He was taken to a hospital by one of the police officers. However, when it became clear that he would have to wait a long time to be seen, he signed a waiver of medical treatment so that he could leave. He was then taken to the police station and handcuffed to the wall near a bench. The police gave him some paper towels because the wound on his head had reopened. He sat there for about 10 minutes. Spaargaren then approached him.

¶ 26 Spaargaren said that she had had a conversation with Mathis, who had told Spaargaren that she was with the defendant earlier when he was stopped by the Waukegan police and was asked to give a DNA sample. Spaargaren told him that Mathis had also said that he was wanted for a murder and that, to escape being captured, he went to Indonesia. The defendant testified that he did not say anything in response to these statements.

¶ 27 Spaargaren then asked the defendant if he was wanted for a murder. The defendant told her that to his knowledge he was not wanted, and that if she wanted to confirm that by searching the computers, he wasn't going anywhere, as he was chained to the bench.

¶ 28 Spaargaren then asked the defendant how his blood had gotten into Reckling's car. The defendant responded that he had been told by his attorney not to answer or discuss the case with anyone. The defendant denied ever telling Spaargaren that "I was DNA tested, and I left to Indonesia when they found out I did it, but now I am safe because another guy is doing the time." During the questioning by Spaargaren, Erickson was five or six feet away at a desk. The defendant thought there were four or five other officers in the room. It was sort of loud in there. Spaargaren was talking in a normal tone of voice, loud enough for him to hear. There was one other individual chained to the bench next to him. The defendant remained at the police department until 7 a.m. the next morning.

¶ 29 On cross-examination, the State elicited some background on the defendant. He was 42 years old at the time of the questioning. He had finished three years of college. He had been read his *Miranda* rights in the past. Asked if Spaargaren read him his *Miranda* rights, the defendant said, "If she did, I didn't hear her," and said that he did not recall anyone else reading him his rights, either. Spaargaren's questioning of him was brief, lasting less than five minutes, and neither she nor any other police officer threatened him in any way or used any

physical force on him. He did not have any difficulty understanding Spaargaren's questions. He was not using drugs that day.

¶ 30    The State then questioned the defendant about his interaction with Mathis earlier that night. The defendant said that he had last seen Mathis eight or nine months before then, on the day that he was stopped by the Waukegan police. He had gone to Indonesia, leaving July 4, 2011, and returning in September. He had not seen Mathis after he got back until the night of the incident.

¶ 31    The defendant again denied ever telling Spaargaren that he had been DNA tested and left for Indonesia when they found out he did it. The defendant testified that he had not been aware that someone else had been convicted of the murder and had never heard James Edwards's name. When Spaargaren asked him about his blood being in Reckling's car, he had not known that it was. Spaargaren had not told him that she had spoken with Waukegan police.

¶ 32    On redirect, the defendant said that after he was released by the police he went back to the hospital. He received five stitches to treat the cut to his forehead. Although he had not taken any drugs, he had had a small amount of alcohol—"a quarter-pint"—not long before the incident with Mathis.

¶ 33    Before hearing closing arguments at the hearing, the trial court noted that, although the defendant's motion had been titled as a motion *in limine* rather than a motion to suppress his statement, much of the evidence presented was the same as would have been presented for a hearing on suppression. The trial court asked the parties to address the issue of voluntariness in addition to their other arguments.

¶ 34    In its closing argument, the defense noted that its motion was based on the failure of the police to videotape the questioning of the defendant. According to the testimony, the police had had that capability, and Spaargaren's questioning of the defendant constituted "custodial interrogation" under the recording statute. The defense also noted that there was no corroboration for Spaargaren's testimony that she had Mirandized the defendant before questioning him: neither the defendant nor the other officers present nearby heard any *Miranda* rights read to him, and there was no written waiver signed by the defendant. As to the statement allegedly made by the defendant (regarding the defendant fleeing to Indonesia after he was DNA tested and "they were going to find out I did it"), again there was no proof other than Spaargaren's word that he had made such a statement: the defendant denied it, and Erickson did not hear any such statement. The defense argued that this was exactly the situation the recording statute was enacted to prevent.

¶ 35    Regarding voluntariness, the defense reviewed the factors listed in *People v. Slater*, 228 Ill. 2d 137, 160 (2008) (as quoted in *People v. Harper*, 2013 IL App (4th) 130146, ¶ 20): "the totality of the circumstances surrounding the statement, including: (1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of the detention." Of these factors, the defense conceded that many favored a finding of voluntariness, but stressed the defendant's head wound, his consumption of some alcohol earlier that evening, and the evidence that he did not receive any *Miranda* warnings. The defense also noted that the trial court must consider the separate factor of the reliability of the statement and argued that the factors it had mentioned earlier indicated that the statement was suspect.

¶ 36    The State's closing argument conceded that there had been custodial interrogation of the defendant as defined in the recording statute and that the statement had not been recorded, and thus the defendant's statement was presumed inadmissible. The State argued that the statement should nevertheless come in under two of the statutory exceptions: subsection (e)(viii), which permits the use of statements "given at a time when the interrogators are unaware that a death has in fact occurred"; and subsection (f), which provides that the presumption of inadmissibility can be overcome by "a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(e)(viii), (f) (West 2010). As to the first exception, the State argued that Spaargaren had not been able to confirm Mathis's story regarding the Waukegan murder investigation by the time she questioned the defendant, so she was not aware that a death had occurred. As to the second exception, the *Slater* factors favored a finding of voluntariness—the defendant was middle-aged, educated, and despite the lacerations to his head and perhaps his hand, he understood the questions and answered them coherently. The recording statute was enacted to prevent coercive tactics by the police, and here the defendant did not claim that any such coercion occurred. The State also argued that Spaargaren's testimony that she verbally gave him *Miranda* warnings was "unimpeached." Thus, the State argued, the defendant's statement was voluntary and reliable. In rebuttal closing, the defense noted that, in *Harper* (a case involving the recording statute), the reviewing court had determined that the defendant's unrecorded statement was reliable based in part on a comparison with prior recorded statements by the defendant, which corroborated the unrecorded statement. Here, however, there were no such prior statements. Instead, the defendant had declined to make a statement, but one police officer claimed that he did make one. Thus, there was no proof of reliability.

¶ 37    The trial court denied the motion *in limine*. It found that the police had taken the defendant into custody. The police provided the defendant with the opportunity to be seen by a doctor, but the defendant refused treatment. The court found that the defendant's recall of the events of that evening was detailed and indicated that he was not suffering the effects of any intoxication. The court also stated that it found the defendant's "recollection of events certainly, in my view, and based upon what I observed during the course of this hearing, slanted to his particular point of view and to what he perceives to be in his best interest." The court did not indicate which specific points of the defendant's testimony it considered biased by self-interest. The court repeated that the defendant "certainly indicated in great detail all of the facts concerning his evening with the Chicago police."

¶ 38    The trial court found that the defendant had been transported to a police station where he was handcuffed "to a bar in an interrogation room." It found that "[t]here were a number of individuals that were present during the time that Mr. Whitfield was present along with the police," commenting that it found "the officer's testimony on this point to be extremely clear and credible." It then continued, "It appears that Mr. Whitfield was Mirandized at that time; and the officer engaged in some general questioning of Mr. Whitfield, which was extremely short in duration."

¶ 39    The trial court indicated that its ruling was based primarily on subsection (f) of the recording statute, under which the presumption of inadmissibility can be overcome by evidence that the statement was voluntary and reliable considering the totality of the circumstances. It then reviewed the *Slater* voluntariness factors, finding that the defendant's age, intelligence, and education supported a finding that the statement was voluntary and that

the defendant's physical condition had not prevented him from understanding the situation despite the fact that his forehead wound later required five stitches. The interrogation was brief and, as the court had noted earlier, it found that the defendant had been Mirandized.

¶ 40　　The court commented that, although voluntariness and reliability were separate inquiries, they overlapped in terms of the evidence that it should consider. It concluded:

"Under these circumstances, based on all of those facts that I have enumerated; based on the fact that I don't find anything to indicate in the record that Mr. Whitfield was either intoxicated, suffering from some type of physical disability, was subjected to any type of undue coercion or any type of lengthy custodial interrogation that would render his statements somehow involuntary or somehow trigger the fact that they should be suppressed as being anything other than voluntary; I find the record simply devoid of anything that would support that type of conclusion.

The only thing that remains is whether or not I find that this statement is sufficiently voluntary and reliable such that it can be admitted or overcome the presumption of inadmissibility.

I simply find that the State has overcome the presumption of inadmissibility by establishing by a preponderance of the evidence that defendant's statements were both voluntary and reliable.

As a result, I find that Section 103-2.1 does not bar the State's use of the statement.

I also find that given the totality of the circumstances; my view of all of the credible testimony that was offered during the course of this proceeding; that Mr. Whitfield's statements were knowingly and voluntarily made after he was appropriately Mirandized."

¶ 41　　　　　　　　　　　　　　　　　　B. Trial

¶ 42　　The defendant had also filed a motion *in limine* to allow him to elicit information regarding the other crimes committed by Edwards. This motion was heard prior to *voir dire* on the first day of trial, April 21, 2014. The defendant argued that it would be important to present evidence that Edwards not only confessed to Reckling's murder but also confessed to committing several other robberies and murders around the same time. The State acknowledged that, under *Chambers v. Mississippi*, 410 U.S. 284 (1973), the defendant could introduce evidence that Edwards had confessed to committing the same murder that the defendant was charged with committing. However, it argued that any evidence regarding Edwards's other crimes was simply an attempt to show that Edwards was a robber and murderer and thus that he had acted in conformity with his prior offenses and had killed Reckling as well. The trial court indicated that it would defer ruling on the motion *in limine* until the issue came up at trial.

¶ 43　　The trial lasted five days. In its opening statement, the State emphasized the DNA evidence linking the defendant to the murder: that evidence tied the defendant to blood found at the scene of the murder (the four droplets on the carpet near the front door of the store) and in Reckling's car. The State also mentioned that it would present testimony by Mathis about the defendant being upset after providing a DNA sample and going to Indonesia not long afterward, and that Spaargaren would testify regarding the defendant's statements along the same lines. The State noted that Edwards had confessed to the murder, but it said that there was

"no evidence to support that" confession; all the DNA matched the defendant. The defendant's opening statement conceded that the DNA from the blood in the car matched the defendant's DNA and that the DNA from the store rug was consistent with the defendant's DNA, but stressed various items of other evidence suggesting that the defendant was not the culprit: the presence of a white man similar to a former Grand Appliance employee in the area of the store on the night of the murder (the defendant was not white), and witnesses who saw a white man changing the tire of Reckling's car that night. The defense also suggested that Mathis's testimony was neither true nor reliable, as it was inconsistent with known facts and she had a motive to lie about the defendant's actions and statements.

¶ 44    The State's witnesses testified as follows. Annie Love, a former Grand Appliance employee, also worked part-time in the office of the church that Reckling attended. Reckling was active in the church and was often there in the evening. On the evening of December 8, 1994, Reckling came by the church about 8:30 p.m. and Love spoke with him for about 45 minutes. He said that he was returning to the store. She saw him leave the church and get into his black Lincoln Town Car. Reckling often worked at the store during the evenings, and he would keep the front door locked when he did so. On cross-examination, Love testified that a white man named Ian Duffy had worked at Grand Appliance but was let go. She did not know why Duffy had been terminated or about his relationship with Reckling, but she gave the police his name during the investigation because his termination occurred not long before the murder.

¶ 45    Stan Binning, a contractor who regularly bought appliances from Grand Appliance, arrived at the store about 8:15 on the morning of December 9, 1994. The front door was unlocked, and when he entered the store, he saw signs of a disturbance near the entrance (glass from a shattered fluorescent light bulb and a ladder lying on the floor). He saw no one in the store, and he proceeded to a counter near the back where he began to fill out paperwork for a dishwasher he wanted to purchase. A store employee, Heidi Williams, arrived soon afterward. She noticed that Reckling's car was not in its usual place in the parking lot. Reckling usually arrived about 8 a.m. to open the store. It had snowed during the night before, and there were no tracks in the snow. When she entered, the front door was unlocked, and she heard a faint alarm. There were papers scattered on the floor. She called Mark Reckling, Reckling's son and a co-owner of Grand Appliance, who directed her to go see what the papers were. They were customers' checks, credit card slips, and deposit slips of the type that Reckling would normally take to the bank in a blue bank bag each evening. However, the bank bag was missing and there was no cash on the floor. As she began to walk through the store and turn the lights on, she saw Reckling lying motionless near the refrigerators with blood pooled under his head. She called 911 but was so upset that she had difficulty completing the call. Williams also testified that Reckling had two sets of keys, as he kept his car keys separate from the business keys.

¶ 46    John Sivia, a delivery driver for Grand Appliance since 1992, testified regarding Reckling's business practices. Reckling arrived at the store by 8 a.m. each day. The store closed at 8 p.m. each night and that was when Reckling would lock the front door. However, Reckling often stayed late to do paperwork, and he would take the day's deposits to the bank on his way home. Reckling was concerned about his employees. Employees sometimes cut themselves when moving the appliances; Sivia had cut himself on sheet metal or screws in the past. If an employee was injured while at a customer's house, Reckling would pick the employee up and take him or her to the hospital. He also sometimes allowed employees to drive his car. The defendant was never employed by Grand Appliance to Sivia's knowledge,

but he could have been a customer who came to the store; Sivia would not have known if he was.

¶ 47     On December 8, 1994, the day before Reckling's body was found, Sivia borrowed $20 from Reckling. He saw Reckling's wallet then; it was full of cash and probably had several hundred dollars in it. Reckling kept his wallet in his left rear pants pocket.

¶ 48     On December 9, 1994, Sivia drove by Reckling's house at about 8 a.m. on his way to work. Reckling's Lincoln Town Car was not in the driveway, and the snow was undisturbed. When Sivia arrived at the store, Reckling's car was not there either, and again, there were no tracks in the snow. Sivia waited for a few minutes but did not see anyone. He went back to Reckling's house and knocked on the door, but there was no answer. He then returned to the store, where he eventually saw Binning moving near the entrance to the store. He went into the store, where Williams was trying to call 911. He described the scene at the store in the same way as Binning and Williams. When he saw Reckling's body, he saw that Reckling was wearing the same clothing he had been wearing the day before. Reckling had a jacket on, as if he had been preparing to leave the store.

¶ 49     Mark Reckling testified that his father was 71 years old at the time of his murder. Mark co-owned Grand Appliance with his father. The company had three stores. The Waukegan store was the main store, and his father oversaw that store. In 1994, an alarm was installed in the Waukegan store, but Mark found out later that it was never hooked up to call the police department because of a technical glitch. If the alarm went off, it would sound very loudly in the store for about 15 minutes, and then it would switch to a quieter sound just to indicate that it had been triggered.

¶ 50     On December 8, 1994, his father left the store about 6 p.m. to pick up Mark's daughter from her music lessons. His father brought her to Mark at the store and then went to church. Mark left the store about 8 p.m. He turned the lights off and locked the front door but thought he did not set the alarm because he knew that his that father would be returning.

¶ 51     An employee called Mark about 8:40 a.m. the next morning, wondering where his father was. He eventually went to the store. When he arrived, the police were there and they would not let him in at first. The police showed him checks that had been retrieved from the floor of the store; the checks had been stamped on the back so that they were ready to be deposited. At trial, Mark was shown deposit slips that had been gathered from the store on December 9, 1994. He identified them and testified that they indicated cash deposits of $1700. Mark testified that his father also carried cash in his wallet and that his father wore his jacket only when he was outside, not while he was working in the store. On cross-examination, Mark testified that he occasionally drove his father's car. He first testified that it was "very, very rare" that anyone else drove that car, but he was impeached with prior testimony that "other people drove the car quite often." It was very possible that employees could get hurt and bleed while working in the store, for instance while opening cartons, but Grand Appliance had never employed the defendant.

¶ 52     Witnesses connected with the initial investigation testified as follows. Lou Moore, a Waukegan police officer, responded to the scene and spoke with some of the witnesses. He knew Reckling personally and was able to recognize him as the victim. Steven Jones, an evidence technician with the Waukegan police, also responded to the scene. He secured the scene and then began gathering evidence. He found no evidence of forced entry at the front entrance to the store, although there was broken glass from a shattered fluorescent light bulb.

He took fingerprints from the inside and outside of the front doors. Jones then moved to the location of Reckling's body. He observed wounds to Reckling's scalp and head. He found blood under Reckling's head and also blood spatters on a nearby refrigerator door, along with gouges in the door, which he believed were made by a metal object. Reckling's clothing was torn: his right pocket was inside out and had been torn away, and his jacket pocket had been ripped. A set of keys was lying near the body.

¶ 53    Jones and another evidence technician crawled from the body toward the front entrance, looking for blood and fibers. On a carpet near the front door, he found four "droplet-type" stains that he believed could be blood. He cut out pieces of carpet containing the stains and placed them into envelopes to take to the police station, where they would be allowed to dry before being sealed in evidence envelopes.

¶ 54    Mark Witek, a forensic pathologist with the Lake County coroner's office, performed Reckling's autopsy on December 9, 1994. He observed three sets of parallel lacerations on the right side of Reckling's head, a bruise near his right eye, and a bruise on his shoulder. An X-ray revealed that both bones in Reckling's left forearm were broken. The lacerations suggested that Reckling had been struck three times with a heavy, somewhat irregular weapon with squared sides. It could have been a gun, although the injuries were consistent with many weapons. The autopsy of the skull showed fractures and depressions of the skull bones. There was extensive bleeding into the brain on the right side and bleeding of the brain itself on both sides. He found no foreign material such as wood splinters in the wound.

¶ 55    Margaret Miller testified that she lived on the north side of Chicago in 1994. On about December 10, she noticed a black Lincoln Town Car parked in front of her house. She observed it for the next week or two, during which time it was not moved. She could see grocery bags through the back windows. Eventually, she called the police because she believed that it had been abandoned.

¶ 56    James Moore worked for the Illinois State Toll Highway Authority, doing highway maintenance. On December 21, 1994, he was working with James Beake, cleaning debris from the edge of the roadway in their assigned section, which was the stretch of I-94 from the Wisconsin state line south to Lake Cook Road. Beake was driving while Moore looked for debris from the passenger seat of their truck. He saw a wallet in the grass about 10 to 12 feet from the side of the road near the ramp from Route 60. They stopped and he retrieved the wallet. The wallet contained Reckling's driver's license. Moore had read of the murder and recognized the name. He placed the wallet on the dashboard without looking through it any further and called the Illinois State Police.

¶ 57    According to a stipulation read into the record at trial, if called to testify, Beake would state that on December 9, 1994, he was picking up trash along southbound I-94 and found a tire, a rim, a car jack, and jumper cables along the ditch line at the entrance ramp from Route 60. The jumper cables were later identified as having been in the trunk of Reckling's car, and the remaining items were from the car as well. None of the items had any blood on them.

¶ 58    James McCarthy, a Waukegan evidence technician, was called to the murder scene on December 9, 1994. He searched a two- to three-block radius around the Grand Appliance store for evidence connected to the murder and also went up to the store roof to see if he could see any evidence, but he did not find any. On December 19, 1994, he traveled to Chicago to retrieve a black Lincoln Town Car. When he arrived, the car was locked. The right rear tire did not match the other three tires and appeared to be a spare tire. The car was loaded onto a flatbed

tow truck and taken to the Waukegan police department, where it was turned over to the Northeastern Illinois Regional Crime Laboratory. Two days later, he and his team responded to a report of a wallet, tire, and rim being found near an entrance from Route 60 onto I-94. His team searched the entire area but did not find any additional evidence.

¶ 59 Waukegan police detective Donald Meadie was assigned to the murder and submitted the request that all local law enforcement agencies in Lake, Cook, and McHenry counties be notified of Reckling's missing Town Car. On December 19, 1994, he went to Chicago to retrieve the Town Car, which had been reported abandoned. He found it locked with a spare tire on the right rear wheel. He could see grocery bags in the back. He later investigated and found that the groceries came from Franklin Foods in Waukegan. Mark Reckling told him that the victim shopped there and often bought those items. On December 21, 1994, Meadie went to the intersection of Route 60 and I-94 because some tollway workers had found a wallet, tire, rim, and tire jack alongside the road there. The tire and rim matched the other wheels of the Town Car he had retrieved. Some jumper cables and a basket of clothes were also recovered from the area. The next day he returned to the area. The police erected a roadblock and passed out flyers asking for information regarding any sightings of a person changing a tire on a Lincoln Town Car at that location on the night of December 8, 1994.

¶ 60 Jason Howell, a painter, testified that he was working at Hawthorn Mall on the night of December 8, 1994. At about 11:30 p.m. or midnight, he drove home along Route 60 and took the ramp onto southbound I-94. He passed two cars pulled over onto the shoulder, one behind the other. The rear car was a black Lincoln. Someone wearing black clothes and a white hat was bending over near the rear of it. Howell did not see the person's features. The car in front was a red compact car. As he passed, a white man in his thirties was getting out of that car.

¶ 61 William Wilson, a toxicologist working for the Cook County medical examiner, testified as an expert. In 1994, he was working at the Northeastern Illinois Regional Crime Laboratory, doing serology (the study of blood and bodily fluids) and work with firearms. In 1994, the lab was not doing DNA testing. Rather, the lab performed tests that could identify blood type (A, B, AB, or O) and the presence of certain genetic markers for blood enzymes. These types of tests were still considered scientifically valid, but they had been surpassed by DNA testing, which could identify as many as 70 variations instead of perhaps 3.

¶ 62 On December 19, 1994, Wilson and others from the lab traveled to the Waukegan police department to examine a 1993 Lincoln Town Car that had been brought in. The car was locked, and while they waited for a locksmith to arrive, they processed the outside of the car for fingerprints and trace evidence. After the car was unlocked, they inventoried the contents of the car, taking photos of the interior and trunk before and after the contents (grocery bags and some debris) were removed. When they opened the trunk, Wilson saw that the spare tire was not in its customary place; instead, it was mounted on the right rear wheel. The original tire and the tire jack were missing.

¶ 63 Wilson saw stains that he thought might be blood in three locations: on the driver's seat, near the left edge; on the threshold (the floor between the driver's side door and the seat); and on the steering wheel. He found no blood in the trunk, on the spare tire, on the passenger seat, on the cassette tapes found in the car, or on any of the contents of the car. He transferred the stains he found onto cotton threads, creating several threads for each stain. He also transferred non-stained areas onto threads for comparison purposes. Wilson detailed the manner in which

the stains were transferred onto the threads and the chain of custody for the threads. The envelopes containing the threads were sent to the crime lab for testing.

¶ 64    Wilson analyzed the threads in February 1995. Before then, he received additional evidence: pieces of carpet collected from the murder scene. He transferred the stains from the carpet onto threads in the same manner as the stains from the car. He also received blood from Reckling and from Edwards, for comparison purposes. Wilson performed the same analysis on all of the evidence, using only one of the threads from each stain and one comparison thread. As to the various stains, he determined that they were all human blood, and he determined the blood type and the genetic markers present. Through this analysis, he was able to conclude that neither Reckling nor Edwards was the source of the blood. He stored the remaining threads for future testing. On cross-examination, Wilson stated that he could not determine the age of any of the stains in the car and that they could have been created after the murder, when the car was in Chicago.

¶ 65    Jason Gutke, a detective with the Waukegan police department, testified that he was assigned to Reckling's murder case in 2011. The police were looking for the defendant pursuant to a warrant to take a DNA sample from him, which was issued on June 20, 2011. In trying to locate the defendant, Gutke visited the defendant's aunt and uncle, who gave him the defendant's cell phone number. On June 24, 2011, he received information that the defendant's cell phone was within range of a cell tower near Route 41. Two Waukegan police officers, Zupec and Ulloa, pulled over the truck that the defendant was driving. Gutke and his partner were the backup. Gutke went to the passenger side window, where he saw a woman later identified as Mathis. He asked her to get out and to get into the back of his police car; the defendant was placed in the other police car. Both cars drove to a nearby hospital, where Gutke, Zupec, and Ulloa accompanied the defendant in to have a buccal swab for DNA taken. Gutke's partner remained in the police car with Mathis. The police then returned the two to the truck, which drove off. There was no warrant for the defendant's arrest. Jeff Ferdina, a Waukegan police evidence technician in 2011, testified as to the chain of custody of the buccal swab taken from the defendant.

¶ 66    Kenneth Pfoser, the DNA technical leader at the Northeastern Illinois Regional Crime Laboratory, also testified as an expert. He gave a lengthy explanation of how DNA information was stored on the DNA chain, how DNA was extracted from samples, and how it was tested. Pfoser analyzed the DNA from the stains in the car, the stains on the carpet, Reckling, Edwards, and the defendant. There were 15 loci of DNA information. As to the car stains, he was able to retrieve DNA information for all 15 loci from the stains on the driver's seat and the threshold. This DNA matched the defendant's DNA. The odds of such a match occurring randomly would be one in 22.3 sextillion African Americans, or the population of about one trillion planet earths. The DNA from the carpet stains yielded information from 14 out of 15 loci. This DNA was consistent with the defendant's DNA, and the chance of such a similarity occurring randomly was astronomical, but Pfoser did not use the term "match" unless all 15 of the loci were present and could be compared. As to the steering wheel stain, Pfoser was able to obtain information from only two loci. The defendant could not be excluded as the source of this DNA information, but the odds of a random match were higher, one in 145 African Americans. Both Reckling and Edwards were excluded as the source of the DNA from the carpet and the car stains.

¶ 67    Spaargaren testified that she encountered the defendant and Mathis on the night of April 17, 2012, when she and her partner responded to a call of domestic battery. Mathis was brought to the police station in their squad car. On the way, Mathis told Spaargaren that the defendant was wanted for a murder in Waukegan. Spaargaren took Mathis to a processing room in the police station. Mathis was no longer in that room when the defendant was brought in about 30 minutes later in handcuffs. Spaargaren had not spoken with any other police officers at that point; she knew only what Mathis had said.

¶ 68    Spaargaren testified that, before she began questioning the defendant, she Mirandized him "from memory," and she recited what she had told him. The defendant said that he understood. Spaargaren asked the defendant if he was wanted for a murder in Waukegan, and he said "What?" She repeated the question. She testified that he then said, "they DNA tested me for a murder in Waukegan, and when I found out they knew that I did it, I left out to Indonesia." He then said that he did not want to talk anymore and she stopped asking him questions. When she questioned the defendant, he was about three feet away from her. There were other officers nearby. The conversation lasted five or six minutes.

¶ 69    On cross-examination, Spaargaren stated that she had been trained in interrogation techniques in 2008. She admitted that she did not videotape the defendant's statement but asserted that she was not legally required to do so because she was a patrol officer, not a detective. During this exchange with the defendant's attorney, Spaargaren nonresponsively inserted the fact that the defendant was wanted for a battery when she questioned him. Spaargaren conceded that, although she had prepared a report that evening in which she noted the defendant's statements, she did not write down her questions or the defendant's statement that he did not want to talk further. In her report, she wrote: "subject when questioned *** stated 'I was DNA tested and then left to Indonesia when they found out I did it.' " According to Spaargaren, this was "word for word" what the defendant said. This written version of the statement differed slightly from her earlier testimony regarding the statement.

¶ 70    The final State witness was Mathis. She testified that she began dating the defendant in April 2011. He was a truck driver, and she would sometimes accompany him on his route. On June 24, 2011, they were pulled over by the police, who took them to the hospital. The defendant entered the hospital and was inside for 45 minutes to an hour. They were then driven back to the truck. When the defendant got into the truck and resumed driving, he began shaking, smoking cigarettes, and even crying. She asked him what was wrong.

¶ 71    According to Mathis, the defendant told her all of the following as he drove to Chicago. He said that he had killed someone a long time ago, maybe 17 years ago. He had been doing heroin that day and had been looking for someone to rob. At an appliance store in Waukegan, he robbed a man and hit him on the head with a gun three times. The defendant got a cut on his hand. The man was 71 years old. He took the man's wallet, the man's car, and some cash that was in a register. He drove off toward Chicago but he got a flat tire. He had to stop and flag someone down to help him change it. He later abandoned the car. Mathis testified that, after he told her all of this, he drove the truck to a Jewel and left it in the parking lot, where he had someone pick him up. Mathis left separately.

¶ 72    The defendant called Mathis three days later and asked her to check the Internet to see if he was wanted for the murder. She "told him no." He called her a couple of weeks later and asked her the same thing. She checked the Internet and did not find anything.

¶ 73    In July 2011, he called her and said that he was in Indonesia. After that, she went to the police to report what he had told her. (Asked why she had waited, she said that she was afraid to contact the police before then.) On July 19, 2011, she met with two Waukegan police officers, Detectives "Andy" and Zupec, and told them what the defendant had said. They asked her to write out a statement, which she did. They also showed her photos and she identified someone. At some point, she looked up the crime on the Internet and found out that an old man had been robbed at a store.

¶ 74    She did not see the defendant again until April 2012, when she saw him in Chicago, in the evening. The police were called, and she went with a female police officer to the police station. She told the officer that the defendant was wanted for murder.

¶ 75    On cross-examination, Mathis agreed that she had told the Waukegan police officers that the defendant said that on the day of the murder, he took a bus to Waukegan after getting off work. At that time, he lived and worked in Evanston. The defendant also told her that he had a gun wrapped in a cloth. Mathis gave contradictory testimony about whether the defendant had boarded the bus with the gun, saying first that he had not and then that he had. She repeated that the defendant had told her that the victim was 71 years old and that the defendant had hit him three times, although she did not report those facts in her written statement to the police. (In her police statement, she stated that the defendant had said he struck the man twice on each side of the head.) She stated that she told the police that the defendant abandoned his truck after the June 2011 DNA test, although that was not in her statement either. Mathis testified that she did not find out that the defendant had married a woman in Indonesia until after she spoke with the Waukegan police. However, she was impeached with her written statement, which indicated that she had found out earlier that day about the marriage through a Facebook post. Her written statement also indicated that she had looked up the crime on the Internet before contacting the police.

¶ 76    During the April 2012 altercation between herself and the defendant, she hit him in the head with a pipe because he had tried to cut her. At the police station, she told the woman police officer "out of self-defense" that the defendant was wanted for murder, even though she did not know whether that was true. The woman officer told her that they did not "have anything on him." At that point, Mathis had already read the information about the case. Mathis told the officer to check the Internet and told her about the defendant having "blood" taken for a DNA test.

¶ 77    Before resting, the State read various stipulations into the record. The parties stipulated that the murder scene, the checks and deposit slips recovered at the scene, Reckling's car, and the items associated with the car were all checked for fingerprints. One fingerprint of evidentiary value was recovered from each of the following items: the checks and deposit slips, the car, and the jumper cables recovered from the side of the highway. None of these three fingerprints matched the defendant, Reckling, Edwards, or Duffy (the former Grand Appliance employee). Of the fingerprints having evidentiary value from the murder scene, three matched Reckling, and none matched the defendant, Edwards, or Duffy.

¶ 78    The defense presented the testimony of Michael Wales. On December 8, 1994, he was working at the Deerpath Inn in Lake Forest, with his then-girlfriend, Holly, now his wife. He left work about 10:30 that evening, with Holly following in a separate car. He drove toward his home along Route 60 and then turned onto the ramp for southbound I-94 at about 10:45. He saw a black car pulled over onto the shoulder. It was the only car on the shoulder. The only

person he saw was a white male wearing a hoodie, who was by the trunk. He did not see the passenger's side of the car or any flat tires.

¶ 79   When Wales received the subpoena to testify at the trial, he recognized the defendant's name. They had been in culinary school together in Evanston in 1993. Wales had not seen or heard from the defendant since then. Wales was positive that the person he had seen near the car in 1994 was not the defendant; the person he saw was white and the defendant was not. Holly Wales then testified consistently with Wales about seeing a "dark nice car, a larger style" on the shoulder of the I-94 ramp as they drove home on December 8, 1994.

¶ 80   After the Waleses testified, there was a lengthy discussion out of the presence of the jury regarding whether the defense could elicit evidence of the other crimes committed by Edwards, in the course of presenting evidence about Edwards's statement that he murdered Reckling. The defense argued that it should be permitted to introduce the other-crimes evidence as part of showing how Edwards came to be in police custody. The State argued that the other-crimes evidence was irrelevant and would improperly dispose the jury to find that Edwards in fact murdered Reckling based upon his criminal propensities. The trial court permitted the defense to elicit evidence of Edwards's confession but not of Edwards's other crimes, finding that they were not similar or relevant to the charges against the defendant.

¶ 81   Michael Quinn, a Waukegan police officer, testified that in January 1996 the police had a man named James Edwards in custody. Quinn and his partner, Mark Tkadletz, read Edwards his *Miranda* rights at about 10:45 p.m. on January 4, 1996, and began questioning him "about several different matters." When they brought up the Grand Appliance murder, Edwards said, "You're talking death penalty," and steered the discussion to other things. The questioning continued until about 2:30 a.m. At that point, Edwards said that he was tired. He put his head down on a table and napped for an hour. The police questioned him further after that. About 4:30 a.m., Edwards was allowed to go to a cell to sleep. The police knew that Edwards was a drug addict. About 9 a.m. that morning, other detectives began questioning Edwards.

¶ 82   Quinn and Tkadletz began questioning Edwards again at about 6 p.m. that day. Quinn went to speak with Edwards's wife at one point, and she then called Edwards. After Quinn returned to the station, Edwards said that he "needed a few minutes" and then told Quinn and Edwards that he had killed Reckling on December 8, 1994, by hitting him with a wooden table leg. He had been looking for a place to rob and saw Reckling going into a business, leaving his car running. Edwards said that he followed Reckling and hit him on the head. He took between $1300 and $1600, leaving the money bag, and left in Reckling's car. He drove the car toward Chicago but the car was messed up and he had to change the tire. He left the car in Chicago "near Flukey's."

¶ 83   On cross-examination, the State elicited inconsistencies between Edwards's confession and the evidence at the murder scene. For instance, Edwards said that he saw keys in the entrance door to the store; that he hit Reckling "in the face"; that he struggled with Reckling in the back of the store, not in the front near the refrigerators; that he threw the murder weapon, a table leg, out the window of the car while he was driving on Grand Avenue in Waukegan; and that he left the car parked in a parking lot, not on the street, near Flukey's, a restaurant that had been located at 86th Street and Cottage Grove Avenue in Chicago but had closed 10 years earlier. Quinn testified that he did not know that all of these statements were contradicted by the evidence in the case. On redirect, Quinn agreed that a black eye such as the one noted in

Reckling's autopsy would qualify as an injury to the face. The defense also called Tkadletz, who testified similarly to Quinn about Edwards's questioning and his statement.

¶ 84        Truman Prewitt testified that in December 1994 he worked in a Verlo mattress store two or three blocks away from the Grand Appliance store where the murder occurred. On December 8 at about 7:45 p.m., a white male walked past the mattress store and appeared to be "casing" it as if he wanted to rob it, looking into both windows and the door, and then walking the other way and doing it again. Prewitt saw the man from about 30 feet away. The incident made Prewitt nervous, so he locked the door even though there were still 15 minutes until closing time. The next day, when he heard about Reckling's murder, he called the police to report the incident. They came by and showed him some photos, and he picked one out.

¶ 85        Out of the presence of the jury, the defense advised the court that it wished to call William Amattey as a witness. Amattey was an attorney whom the defendant had contacted about filing a petition for the defendant's Indonesian wife to obtain a visa to enter the United States. The defense wished to elicit the information that, although the defendant's first visit to Amattey's office occurred in December 2011 (after the defendant returned from Indonesia), the defendant had first contacted Amattey about one year earlier, in December 2010. The defense argued that this evidence was important to rebut the inference that the defendant's travel to Indonesia showed consciousness of guilt, when in fact the trip was preplanned. The State argued that the testimony would be hearsay. The defense agreed not to elicit the substance of any of the conversations between the defendant and Amattey. The trial court accepted the State's argument and ruled that it would not permit Amattey's testimony. The defense then rested its case.

¶ 86        In its closing argument, the State once again emphasized the DNA evidence, which showed that the blood on the store carpet and inside Reckling's car matched the defendant's DNA. It ridiculed the theory that a 25-year-old man who lived in Evanston would have traveled on some other occasion to the Grand Appliance store in Waukegan where he was cut and bled on the carpet, and then broke into Reckling's car when it was parked in Chicago (without any signs of forced entry) and bled some more in the car. Noting the defendant's statements to Mathis and Spaargaren, the State then argued that there were "two confessions and the flight to Indonesia" that also showed that the defendant committed the murder. Finally, the State downplayed Edwards's confession to the murder, noting that Edwards's DNA did not match any of the blood found at the scene or in the car.

¶ 87        The defense emphasized various inconsistencies in the State's case, including the witnesses who saw a white man, not an African American like the defendant, changing the tire of the Town Car on the night of the murder, and evidence suggesting that the murderer knew Reckling and knew that he kept two sets of keys. As for the DNA, there was no evidence as to how old it was or when it was deposited in the store or the car. Notably, there was no blood or fingerprints on the items the murderer would have handled that night, including the rim, the spare tire, and the tire jack, and the State evidently did not feel confident enough of the DNA evidence to issue a stop request or a warrant after the police took the defendant's DNA sample in June 2011. The defense argued that Mathis was biased against the defendant and had the opportunity to research the known facts of the case before she spoke with the police. There were no telephone records to show that the defendant ever in fact called her. Spaargaren was not credible, either, as her unrecorded interrogation of the defendant was "sloppy" and there were inconsistencies between her account and Mathis's testimony. Finally, Edwards had

confessed to Reckling's murder. In rebuttal, the State argued that the white male seen near the Town Car on the night of the murder was the person who had stopped to help.

¶ 88 During deliberations, the jury sent out a note asking, in pertinent part: "Can we see Spaargaron's [*sic*] informational report? The one where she quotes him as admitting. Also—she referenced another report during her testimony, can we see that one too?" The defense attorney suggested that the jury be told that they had all of the information they needed. The trial court sent back the message, "You have all of the evidence. Please continue to deliberate." The jury convicted the defendant of first degree murder, finding that he was over the age of 18 and that the killing occurred in the course of another felony. The jury also found that the victim was over 60 years old. The trial court denied the defendant's motion for a judgment notwithstanding the verdict or a new trial and sentenced the defendant to life in prison. Following the denial of his motion to reconsider the sentence, the defendant filed this appeal.

¶ 89                                           II. ANALYSIS

¶ 90 On appeal, the defendant raises two issues. First, he contends that the trial court erred in denying his motion *in limine* to bar evidence of his supposed statement to Spaargaren pursuant to the recording statute. Second, he contends that certain of the trial court's other evidentiary rulings—denying his request to introduce evidence of Edwards's other crimes and barring the testimony by Amattey as hearsay—unfairly prevented him from presenting his defense and were an abuse of discretion. We take each argument in turn.

¶ 91                       A. The Recording Statute and Defendant's Statement

¶ 92 As noted above, the recording statute bars the use in a murder trial of any statement by the defendant made during custodial interrogation (as that term is defined in the statute) that was not electronically recorded. The State concedes that the defendant's purported statement to Spaargaren was made during custodial interrogation and was not recorded. Thus, under the recording statute, the statement is "presumed to be inadmissible" in any criminal homicide proceeding. 725 ILCS 5/103-2.1(b) (West 2010). However, the State argues that the statement was properly admitted under two statutory exceptions: subsection (e)(ii), which states that a statement is admissible if it was not recorded "because electronic recording was not feasible"; and subsection (f), which provides that the presumption of inadmissibility can be overcome if the evidence shows that the statement "was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(e)(ii), (f) (West 2010). The State bore the burden of proving the applicability of these exceptions. 725 ILCS 5/103-2.1(e) (West 2010); *People v. Harris*, 2012 IL App (1st) 100678, ¶ 61.

¶ 93 We may easily dispose of the State's argument that recording the statement was not feasible. As an initial matter, we note that the State did not raise this argument before the trial court. *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010) (generally speaking, a reviewing court will not consider an argument that was not presented to the trial court). The State asserts that a party may defend the trial court's ruling on any ground supported by the record as long as that ground is not contrary to its previous arguments. *People v. Denson*, 2014 IL 116231, ¶ 17. We acknowledge this rule but its application here is doubtful. Spaargaren testified that she did not record the statement because she believed that, as she was a patrol officer and not a detective, the recording statute did not apply to her questioning of the

defendant. The clear implication of this testimony is that, even if there had been recording equipment in the processing room where Spaargaren questioned the defendant, she would not have used it. Thus, the State's feasibility argument is fundamentally at odds with Spaargaren's testimony. Under these circumstances, *Denson* does not support the State's ability to raise the feasibility argument for the first time on appeal.

¶ 94    Even if we were to consider the argument, however, we would find it meritless. As the State concedes, the testimony at the hearing on the motion *in limine* established that there was recording equipment in the police station where the defendant was questioned by Spaargaren, even if there was none in the processing room itself. We interpret the term "not feasible" in the statute to mean that there was no functioning recording equipment in the police station where the interrogation occurred. Any other interpretation would run counter to the legislative purpose in enacting the recording statute. It would be absurd to imagine that the General Assembly sought to require the electronic recording of all homicide-related questioning "that is reasonably likely to elicit an incriminating response" (725 ILCS 103-2.1(a) (West 2010)), but intended to allow police to avoid this requirement by simply conducting the questioning in a room that does not have recording equipment. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 441 (2010) (in construing statutes, courts "presume that the legislature did not intend absurd, inconvenient, or unjust consequences"). Accordingly, we reject the State's argument that it was not feasible for Spaargaren to record her questioning of the defendant about the Waukegan murder.

¶ 95    The State's more substantial argument is that the presumption against admissibility was overcome by evidence that the defendant's statement "was voluntarily given and is reliable, based on the totality of the circumstances." 725 ILCS 5/103-2.1(f) (West 2010). The State bore the burden of proving this by a preponderance of the evidence. *Id.* In reviewing the trial court's determination of voluntariness and reliability, we apply the same standard of review that governs the suppression of evidence in other contexts: "We review a trial court's factual findings using a manifest-weight-of-the-evidence standard but apply a *de novo* standard of review to the ultimate question of whether the evidence should be suppressed." *Harper*, 2013 IL App (4th) 130146, ¶ 10.

¶ 96    The factors to be considered in evaluating whether a defendant's statement was voluntary are the familiar factors from *Slater*: the defendant's age, physical condition, and other factors affecting his ability to understand the proceedings and the consequences of his choice to give a statement; and the circumstances of the detention and interrogation, including their duration, the giving of *Miranda* warnings, and any indications of physical or mental abuse. *Slater*, 228 Ill. 2d at 160. As the defense conceded during the hearing on the motion *in limine*, many of these factors favor a finding of voluntariness in this case.

¶ 97    The issue of reliability must be considered separately from voluntariness, however. *Harris*, 2012 IL App (1st) 100678, ¶ 66 (emphasizing that whether the defendant's statement is reliable "is a separate inquiry from whether it was voluntary"). This factor addresses the possibility that a statement that was voluntarily given might nonetheless be unreliable or false. The reviewing court in *Harper* outlined some of the factors that can affect the reliability of a statement:

> "A person who is developmentally disabled or a person who is actively delusional may give a statement of his or her own free will, but the voluntary statement may not be reliable because of the mental impediments suffered by the individual. Further, the

- 20 -

statements of a person deprived of food, water, or sleep also may not be reliable because that person may be inclined to say anything in order to have those deprivations terminated. Hypnosis-induced statements have also been found unreliable." *Harper*, 2013 IL App (4th) 130146, ¶ 22.

¶ 98　　In this case, the trial court found the defendant's statement, as reported by Spaargaren, to be both voluntary and reliable. In reaching this conclusion, the trial court focused primarily on the voluntariness factors. When commenting on the reliability inquiry, it noted that the relevant factors overlapped somewhat with the voluntariness factors. It stated that there was no indication that the defendant was "intoxicated, suffering from some type of physical disability, [or] was subjected to any type of undue coercion" (factors that could affect the reliability of a statement), but it then returned to the issue of voluntariness, stating that there had not been "any type of lengthy custodial interrogation that would render his statements somehow involuntary or somehow trigger the fact that they should be suppressed as being anything other than voluntary."

¶ 99　　We are somewhat troubled by the trial court's difficulty in keeping the issue of reliability separate from that of voluntariness. Further, this case presents a different question from most of the case law relating to the recording statute: that case law involves only situations in which the defendant admitted making the statement but argued that it should nevertheless be excluded. See, *e.g.*, *People v. Clayton*, 2014 IL App (1st) 130743, ¶ 14 (defendant testified that she was interviewed twice in the same room; the first interview was not recorded while the second one was); *Harper*, 2013 IL App (4th) 130146, ¶ 19 ("Everyone agrees defendant voluntarily made the statements in question," which were recorded; issue was whether audio malfunction in certain parts of the recording rendered the remaining portions of the recording unreliable); *Harris*, 2012 IL App (1st) 100678, ¶ 17 (defense did not argue that the defendant did not make the statements testified to by the police; issue was whether she was "in custody" at the time of the questioning).

¶ 100　　Here, by contrast, the defendant denies making the statements at issue (that he had been "DNA tested" and subsequently went to Indonesia). According to the defendant, he did not answer Spaargaren's initial questions about DNA testing and merely said, in response to further questioning, that he did not believe that he was wanted for murder and that he had been told by his attorney not to answer questions. Thus, the initial issue confronting the trial court was whether the defendant made the statements attributed to him by Spaargaren. The evidence on this point was conflicting. Spaargaren testified that the defendant did make these statements; the defendant denied that. Erickson, Spaargaren's partner who was seated near her, also denied hearing these statements; he heard only something about the defendant "being stopped by Waukegan" and "about DNA," and that the defendant's lawyer had told him not to talk about anything. Cardenas, who was also present, did not hear any of the interview. (Spaargaren also testified that she Mirandized the defendant prior to questioning him, while Erickson, Cardenas, and the defendant all testified that they did not hear any *Miranda* warnings.)

¶ 101　　The reliability inquiry outlined in *Harris* and *Harper* is not a perfect fit for a case such as this, where the existence of the statement itself is challenged. In *Harper*, the leading case on reliability, the defendant sought to exclude his statement under the recording statute because, although the statement was recorded, portions of the recording were inaudible, through no fault of the State. In concluding that the statement was reliable despite the missing portions, the

reviewing court considered the portions of the recording that were audible, finding that they were consistent with other admissible statements by the defendant. *Harper*, 2013 IL App (4th) 130146, ¶ 23. The court also considered the fact that the State did not contend that the defendant said anything inculpatory during the inaudible portions; rather, the State simply wished to present the audible portions as evidence. *Id.* ¶ 29. Here, by contrast, the State sought to present evidence of an inculpatory statement allegedly made by the defendant that was unrecorded. Further, there were no other statements by the defendant to support either the existence or the reliability of the purported statement. We believe that both of these facts, when coupled with the lack of corroboration of Spaargaren's testimony, weigh in favor of a conclusion that the State did not meet its burden under the recording statute to show that the presumption against admitting the purported statement was overcome. However, we need not determine conclusively whether the trial court erred in denying the motion *in limine* because, even if it did, that error was harmless.

¶ 102 An evidentiary error is harmless "if it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained" (*In re Kenneth W.*, 2012 IL App (1st) 101787, ¶ 75) or when no reasonable probability exists that the jury would have acquitted the defendant absent the error (*In re E.H.*, 224 Ill. 2d 172, 180 (2006)). The defendant argues that his supposed statement to Spaargaren was clearly important to the resolution of the case, and thus its admission was not harmless: the State drew attention to the statement in its closing argument, and Spaargaren's account of the statement was the subject of the note sent out by the jury. We agree that the defendant's purported statement was almost certainly considered by the jury, along with the other evidence in the case. Nevertheless, the likelihood that excluding the statement would have changed the outcome of the trial is virtually nil.

¶ 103 By far, the most damning evidence against the defendant was DNA evidence: the evidence that the DNA from the blood found on the carpet at the murder scene and the blood found in Reckling's car matched the defendant's DNA, a match that was astronomically unlikely to occur randomly. The jury was faced with overwhelming evidence that the defendant shed blood both at the entrance to the store and inside Reckling's car. Although the defense elicited evidence suggesting that the defendant's blood could possibly have been shed in those places if he had been a Grand Appliance customer or an employee, all of the evidence was contrary to this possibility having actually occurred: the defendant did not live or work near Grand Appliance, other Grand Appliance employees testified that the defendant was never employed by the company, and there was no evidence that the defendant was ever a customer.

¶ 104 Further, Mathis testified to an even more detailed confession by the defendant to the murder. Although Mathis's testimony was impeached in some regards, it corroborated other evidence in the case. In light of the compelling nature of the DNA evidence, the lack of any nonhypothetical explanation for the defendant's DNA being found at the murder scene and inside Reckling's car, and Mathis's testimony regarding the defendant's detailed confession to her, we conclude that there is no reasonable probability that the jury would have acquitted the defendant even if the motion *in limine* had been granted.

¶ 105                                B. Other Evidentiary Rulings

¶ 106 The defendant's second argument on appeal is that he was denied his constitutional right to present a complete defense by certain other evidentiary rulings by the trial court, barring him from presenting (1) evidence of the other crimes committed by Edwards and (2) testimony of

Amattey that would have rebutted the inference that the defendant's travel to Indonesia was motivated by a desire to avoid being arrested for the murder. "[W]hen a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 107                           1. Evidence of Edwards's Other Crimes

¶ 108    As is required by the due process clause of the United States Constitution (see *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)), the defendant was permitted to introduce evidence that someone other than him—Edwards—confessed to the murder of Reckling. However, the defendant wished to go further and introduce evidence of other crimes committed by Edwards, such as the series of robberies that initially led to Edwards's arrest and questioning.

¶ 109    When this matter arose at trial, the State argued that Edwards's robberies were not similar to the Grand Appliance robbery. For instance, Edwards was initially apprehended as he fled from a robbery at the Roberts Roost motel. In that robbery, he used a replica of a gun to demand cash, forced the employees into the basement, and pushed a sofa against the basement door. Thus, the State argued, Edwards's other robberies were irrelevant to the murder of Reckling.

¶ 110    The defense responded that the State would introduce evidence that Edwards did not confess to murdering Reckling until almost 24 hours after he was arrested, which would create a false impression in the minds of the jurors that he was questioned at length solely about the murder. The defense argued that it needed to be able to counter this false impression. The trial court agreed with this assertion. The State suggested a compromise, in which the police witnesses involved in Edwards's interrogation would testify that he was questioned at first in connection with "other matters," without specifying what those matters were.

¶ 111    The trial court ruled that evidence of Edwards's other crimes was not relevant to the defendant's trial because, based on the arguments presented, those other crimes were dissimilar and there was no indication that the investigation of the other crimes was intertwined with Reckling's murder. However, it cautioned that the State must not elicit evidence suggesting that Edwards had been questioned solely regarding the murder. The defense then presented the testimony of Quinn and Tkadletz, who stated that Edwards was questioned at length about "other matters" prior to giving a statement about Reckling's murder.

¶ 112    On appeal, the defendant notes that the State was permitted to introduce evidence of Edwards's other crimes (three armed robberies) in its trial against Edwards, and this court upheld the admission of that evidence on the ground that Edwards's criminal history tended to show that his confession to Reckling's murder had not been fabricated by police. *People v. Edwards*, 301 Ill. App. 3d 966, 980-81 (1998). The defendant argues that he should have been permitted to introduce that same evidence at his own trial, for the same reason—to substantiate Edwards's confession to Reckling's murder. The defendant notes that, in the State's opening statement, it asserted that there was "not one shred of evidence that links Mr. Edwards to this case," but in fact there was such evidence—Edwards's confession. In support of his argument, the defendant cites *People v. Tenney*, 205 Ill. 2d 411 (2002), which stated that " 'if it is the sort

of evidence that prosecutors regularly use *against* defendants—then defendants are entitled to use it for their own purposes.' " (Emphasis in original.) *Id.* at 440 (quoting *Lee v. McCaughtry*, 933 F.2d 536, 537 (7th Cir. 1991)).

¶ 113    The State responds that its comment regarding "not one shred of evidence" was made in the context of referring to the DNA evidence of the defendant's presence at the murder scene and in Reckling's car, and thus was understood to mean that no *physical* evidence linked Edwards to the crime. It further notes that *Chambers* created a narrow category of hearsay declarations of culpability that are admissible for reasons of due process, a category that does not include collateral evidence such as the other-crimes evidence that the defendant sought to elicit here. It contends that the evidence of Edwards's other crimes would simply have created an improper inference in the minds of the jurors that Edwards had a propensity to commit crimes. Finally, it argues that the defendant was able to adequately present a defense, not only introducing the fact of Edwards's confession but also casting doubt on the identity of the person who changed a flat tire on Reckling's car and raising alternate possibilities as to the identity of the murderer, such as the former employee Duffy.

¶ 114    In considering this issue, we are mindful that evidentiary issues are the province of the trial court, which is uniquely positioned to determine the relevancy of proffered evidence to the proceedings at hand. Here, the trial court resolved this issue only after a careful weighing of competing considerations. We must review that ruling deferentially, finding error only if the trial court abused its discretion. *People v. Sutton*, 349 Ill. App. 3d 608, 615 (2004). We note that the *Chambers* exception to the general hearsay rule barring the introduction of third-party declarations of culpability is narrow, applying only where there is "considerable assurance of their reliability." *Chambers*, 410 U.S. at 300; see also *Tenney*, 205 Ill. 2d at 435 (characterizing the *Chambers* exception as narrow). The defense argues that the requisite assurance of reliability exists here, given our ruling in *Edwards* that the other-crimes evidence was admissible. We stress that the admission of evidence in one proceeding is no indication that it should be admitted automatically in a different proceeding. Accordingly, our decision in *Edwards* is not dispositive of the issue raised here.

¶ 115    Moreover, *Chambers* involved only a third party's direct statement of culpability for a crime, not collateral evidence such as the other-crimes evidence at issue here. The cases relied upon by the defendant are similarly distinguishable. *Lee* involved a fugitive's statement that he had killed the victim and that the defendant had had no part in it, and the reviewing court held that the trial court had correctly concluded that there were not sufficient indicia of reliability to bring the statement within the *Chambers* exception. *Lee*, 933 F.2d at 538. And while *Tenney* mandated the admission of evidence of an inculpatory statement by someone who was initially convicted of the murder at issue but whose conviction subsequently was vacated, it does not address the admission of collateral other-crimes evidence. *Tenney*, 205 Ill. 2d at 441-42.

¶ 116    The case most helpful to the defendant's argument is *People v. Cruz*, 162 Ill. 2d 314 (1994), in which the supreme court held that it was reversible error to exclude evidence regarding the other crimes committed by a third party (Dugan), because those crimes were similar in significant respects to the murder at issue and thus were relevant to show that Dugan's confession to the murder at issue was reliable. *Id.* at 354. However, the similarity between the other crimes and the murder was essential to the supreme court's holding. *Id.* at 352 (the other-crimes evidence "was admissible to corroborate [Dugan's] statements about the Nicarico murder" because "[t]he requisite degree of similarity [had] been established"). Here,

the trial court found that the other crimes that the defense wished to introduce were not similar to the Grand Appliance robbery and murder, and the defendant has not argued that this finding was erroneous. Accordingly, the trial court did not abuse its discretion in barring evidence of Edwards's other crimes.

¶ 117                              2. Amattey's Testimony

¶ 118    The defendant also contends that he was unable to fully present his defense because the trial court erroneously excluded the testimony of Amattey, the attorney whom he contacted regarding his Indonesian wife's entry into the United States. The defendant contends that this testimony was crucial to rebut the inference that his travel to Indonesia was motivated by a consciousness of guilt following the taking of his DNA sample. We agree that the trial court erred in excluding this testimony on hearsay grounds. However, as with the erroneous admission of the defendant's unrecorded statement, we conclude that this error was harmless in light of the overwhelming evidence against the defendant.

¶ 119    When this issue arose at trial, the defense made an offer of proof, stating that it wished to elicit testimony from Amattey that he had filed a visa petition for the defendant's Indonesian wife. Further, although the defendant first came in to see Amattey on December 8, 2011, the defendant had first contacted Amattey a year earlier seeking information about how to obtain a visa. This evidence, which would not go into the substance of the defendant's conversations with Amattey, would show that the defendant pursued information relating to his trip to Indonesia well before the DNA sample was taken: "I'm not asking for any comments, statements or anything. All I would simply be asking is *** Mr. Whitfield contacted you a year prior to December 8th, 2011? Yes. He retained you for immigration purposes? Yes. That's it." The State objected to allowing Amattey to testify, arguing that it would permit the defendant to "testify" about his motives for going to Indonesia through Amattey's testimony, without taking the stand himself. The State also argued that any testimony about why the attorney was retained would be hearsay.

¶ 120    The trial court refused to permit Amattey to testify on the ground that all of the evidence the defendant sought to present would be hearsay, including the date of the defendant's first contact with Amattey and the tasks that Amattey performed for the defendant. This determination was error.

¶ 121    Hearsay is an out-of-court statement that is offered to establish the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *In re Estate of DeMarzo*, 2015 IL App (1st) 141766, ¶ 19. Much of Amattey's proffered testimony was not hearsay, as it consisted of facts personally known to him, not statements made to him. The date on which the defendant first contacted him, the date of the defendant's first office visit, and a broad description of the work that Amattey performed at the defendant's request (such as the fact that Amattey filed a visa petition for the defendant's wife) are all matters that are not hearsay. Indeed, on appeal, the State does not offer any argument as to why Amattey's testimony on these matters would have been hearsay, instead suggesting that it might have been difficult for the defense to elicit the testimony without delving into the substance of Amattey's conversations with the defendant. This is mere speculation, however, and any such difficulty would have been more appropriately addressed through objections to specific questions, not the wholesale barring of testimony. Further, as part of his fundamental right to present a defense, the defendant had a right to present evidence tending to prove that he did not flee from consciousness of guilt.

*People v. Manion*, 67 Ill. 2d 564, 576 (1977). Thus, the trial court's refusal to permit Amattey to testify was an abuse of discretion.

¶ 122　　Nevertheless, this error was harmless in light of the other evidence against the defendant. Even if the defendant had been wholly successful in countering the State's argument that his travel to Indonesia constituted a flight from justice that indicated a consciousness of guilt (see *People v. Lewis*, 165 Ill. 2d 305, 349 (1995)), the evidence of the defendant's commission of the murder was overwhelming, including the DNA evidence as well as Mathis's account of the defendant's confession to her. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 103 (even trial errors that encroach on constitutional rights do not require reversal where they are harmless beyond a reasonable doubt).

¶ 123　　　　　　　　　　　　　III. CONCLUSION

¶ 124　　Although the trial court erred in failing to exclude the defendant's purported statement to Spaargaren and in barring the testimony of Amattey, those errors were harmless beyond a reasonable doubt and there is virtually no likelihood that, had these errors not occurred, the jury would not have convicted the defendant of first degree murder. Accordingly, we affirm the judgment of the circuit court of Lake County.

¶ 125　　Affirmed.