2024 IL App (2d) 240042-U
No. 2-24-0042
Order filed November 13, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 22-CF-2106 |
| PEDRO CALDERON, | ) ) | Honorable John A. Barsanti, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

*Held*: Defendant's statements were properly suppressed where the trial court's findings as to the testifying officers' credibility and defendant's language barriers were not against the manifest weight of the evidence.

¶ 1    The State appeals the trial court's order suppressing alleged confessions made by defendant, Pedro Calderon. We affirm.

¶ 2                         I. BACKGROUND

¶ 3    On January 5, 2023, the State charged defendant with two counts of predatory criminal sexual assault of a victim under 13 years old (720 ILCS 5/11-1.40(a)(1) (West 2012)) (counts I

and II) and two counts of aggravated criminal sexual abuse of a victim under 13 years old (720 ILCS 5/11-1.60(b), (c)(1)(i) (West 2012)) (counts III and IV). Generally, the complaint alleged that defendant engaged in various sexual acts with the victim, L.C., who was under 13 years old at the time of the offenses but was "presently under the age of 38 years." As early as November 11, 2022, defendant was appearing in court with the assistance of a court interpreter.

¶ 4    On October 18, 2023, defendant filed his motion to suppress evidence, seeking to suppress what defendant characterized as his "unlawful interrogation." The motion described how, on November 10, 2022, defendant was arrested and transported to the North Aurora Police Department, where he was taken to an "interview room and interrogated by [i]nvestigators Dave Smith and Tom Ruzevich." Following the interrogation, in which defendant purportedly "provided self-incriminating answers regarding the allegations in this case," investigators realized that the audio equipment in the interview room had malfunctioned and no audio of the interview was recorded. A second interview was conducted, presumably so that officers could record defendant's statements. However, once more, the audio equipment apparently malfunctioned, making it "impossible to hear any of the questions asked by the investigators or any of the answers allegedly given by [defendant.]" Because no recorded audio of the interrogation existed, defendant argued that, under section 103-2.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-2.1 (West 2022)), any confessions defendant may have made were presumed inadmissible and must be suppressed.

¶ 5    On November 16, 2023, the trial court held a hearing on defendant's motion to suppress. As usual, an interpreter was present to aid defendant. The State conceded that defendant's supposed confessions were not recorded, and that, as a consequence, it was the State's burden to show that defendant's alleged confessions were reliable and voluntary in order to be admissible.

¶ 6    The State called David Arndt, an information technology Manager for the Village of North Aurora, to testify. Arndt recalled being contacted by the Village's police department in November 2022 concerning the recording system in one of the department's interview rooms. After confirming that the system was inoperable, Arndt phoned Griffon Systems, who had installed the recording equipment and would verify that a faulty microphone was to blame. Arndt had a new microphone installed, and since then, the police department had not reported any further issues to him.

¶ 7    The State next called Investigator Dave Smith to testify. Smith testified that he was a criminal investigator for the Kane County State's Attorney's Office, who was assigned to the Child Advocacy Center. On November 10, 2022, a Thursday, he, Ruzevich, and two other detectives had gone to St. Charles to "arrest and look for defendant," who had been accused of "different sexual abuse to a minor child." After his arrest, defendant was transported to the North Aurora Police Department. There, Ruzevich and Smith interviewed him in English, without the aid of an interpreter. At the beginning of the interview, Smith offered defendant a cup of water and advised defendant of his *Miranda* rights through the use of a standardized form, which included Spanish and English versions. Defendant indicated that he understood his rights before signing the form. Defendant, who introduced himself to officers as "Pete," purportedly went on to generally describe himself and his family, including the minor victim, whom he had babysat "over eight years" in the past.

¶ 8    Smith informed defendant of the allegations against him, leading defendant to admit that he had previously placed his mouth on the victim's vagina. According to Smith, defendant had been so distraught with his actions that he "went to see a priest" to ask "for forgiveness." Smith asked defendant whether he had ever forced the victim to place her hand on his penis, which

defendant initially denied. Eventually, after being questioned further by Detective Ruzevich, defendant relented and admitted to "plac[ing] the little girl's hand on his penis." Defendant denied that he ever had "rubb[ed] his body with an erection on her body," but he did admit that he had previously rubbed the victim's stomach area while pressing himself onto her. Defendant had further informed the investigators that he had never held down or hurt the victim.

¶ 9    The investigators asked defendant whether he had forced the victim's sister to watch pornography on his phone. Defendant denied that he had, but he explained that she had unexpectedly interrupted him while he was watching pornography and masturbating in the past. The interview concluded after approximately 50 minutes.

¶ 10    After completing the interview, Smith was informed that "the interview room was not recording." Smith did not check the audio equipment, but instead "decided that [they] should start the recording again and bring [defendant] out of [his] cell and summarize exactly what [they] had talked about *** in the prior interview." He and defendant entered the same interview room, where he reminded defendant of his *Miranda* rights. Smith summarized everything that had been discussed with defendant earlier. Defendant confirmed Smith's recollections and made no further admissions. The second interview lasted approximately eight minutes. After completing the second interview, Smith returned to his office, where he "contacted the State's Attorney's Office for felony review and prepared the charging documents." Before leaving the department for a three-day weekend, Smith received a copy of the interview, which he did not immediately review. Upon his review of the recording the following Monday, Smith "noticed that the first interview was actually on that video with no sound and the second interview was also on there and that had no sound as well." Smith immediately contacted a supervisor to see whether the audio from the interviews could be recovered. He never received the recordings, however.

¶ 11    Smith could recall some "direct quotes" from his first interview with defendant. For instance, Smith recalled that defendant had stated that he "couldn't help himself" once he saw the victim. Smith also recalled defendant's demeanor as being generally remorseful. Smith took some notes during the interview, which the State characterized as being "pretty bare bones," as there was "not a lot of information contained" therein, save for the ages and names of the involved parties. Smith made no notes of any questions that he had asked defendant, nor did he notate any of defendant's answers. The notes included no references to any phrases or quotations defendant said. The entirety of the notes Smith took at the interview—with certain redactions of the alleged victims' names—can be found below:



¶ 12    On cross-examination, Smith testified that, "for the most part," interviews were recorded for later reference when compiling an interview report. However, in the instant matter, he had waited four days "or shortly after" to generate a report on defendant's interview. Upon further questioning, Smith admitted that it was not until an entire week had passed that he finally created his report of his interview with defendant. Smith also admitted that, during that week, he had conducted other interviews in other cases.

¶ 13    Smith further recalled on cross-examination that he made not one, but two sets of notes

from his interview with defendant. According to Smith, the second set of notes, which had never been previously mentioned or otherwise disclosed, was not used and was discarded before he made the report.[1] Smith did not elaborate on whether the second set of notes contained more detail than the first and, when creating his report, he could only rely on the first, "bare bones" set of notes, his memory of the interview the week before, and the silent recording of defendant's interviews.

¶ 14    Smith, on cross, testified that he was unaware that defendant's primary language was Spanish. However, he did recognize that defendant spoke with "a Spanish accent." Smith did recall defendant "stuttering or having difficulty finding the correct words," but nonetheless maintained that he never struggled to speak English during the interview.

¶ 15    Defendant next asked Smith whether he had checked the interview room's recording equipment prior to beginning the second interview. Despite having just been made aware of the room's recording issues, he did not. According to Smith, the officers there believed that they only needed to "re-flip [a] switch so it would work the second time." However, Smith admitted he did not "re-flip" any switches in the interview room prior to interviewing defendant a second time. Smith did not recall asking "anybody else to turn on the video equipment," but later testified that

---

[1] Smith's destruction of these notes seem to have been violative of the Code, which states that "[a]ny investigative, law enforcement, or other public agency responsible for investigating any 'non-homicide felony' offense or participating in an investigation of any 'non-homicide felony' offense, other than defense investigations, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports and memoranda that have been generated by or have come into the possession of the investigating agency concerning the 'non-homicide felony' offense being investigated." 725 ILCS 5/114-13 (West 2022).

somebody had in fact "turned it on."

¶ 16    Over the State's objection, defendant questioned Smith about an additional interview that he conducted with defendant on December 7, 2022, while defendant was being held at the Kane County jail. Smith confirmed that, at that time, he was aware that defendant "was in custody and *** was charged with these offenses." Smith did not contact defendant's attorney before the interview, explaining that the visit "was regarding a different offense where [defendant] was the victim." Specifically, Smith testified that he "got information from [defendant's] brother that someone else from Kane County jail was asking for [defendant's] money from his brother's house." Thus, he sought to speak with defendant to ascertain "[w]hether or not he was authorizing that money to be released to this other inmate." Smith brought along another investigator from the Child Advocacy Center, Deanna Velazquez. At one point during the 12-minute interview, Smith agreed that Velazquez, who was not a Spanish speaker, "suggest[ed] having an interpreter present because of language struggles" that she had ascertained between the investigators and defendant. Defendant asked whether there were "multiple points throughout that *** interview" in which defendant was "stuttering and [Smith was] having trouble understanding his English." Smith replied, "He was having a hard time understanding what the circumstances were of why I was talking to him."

¶ 17    The interview, which was audio recorded without issue, was published for the court prior to being entered into the record as evidence. In the recording, Smith clearly identified himself and Investigator Velazquez before advising defendant that he was not there to "talk to [him] about [his] case," but rather, he wanted to speak with defendant because of some concerns he had with defendant's brother and "family." Smith asked defendant several questions concerning a phone call defendant's pod mate had made to defendant's brother, but defendant, clearly confused, only

responded with strings of broken English. Velazquez asked whether they needed "a Spanish speaker" to facilitate the interview, and Smith responded, "No, he spoke perfect English before." Smith continued to ask more questions concerning defendant's commissary account, which defendant struggled to understand. However, eventually and with some difficulty, defendant was able to answer some of Smith's questions.

¶ 18    On redirect examination, Smith provided more background information concerning his December 7, 2022, visit to the Kane County jail. Smith testified that he had received a phone call from the defendant's brother, "who indicated that he had been contacted by another inmate who was a roommate or at least in the same pod as the defendant requesting to take money out of the defendant's bank account so that he could provide that money for defendant." Defendant's brother, who was the alleged victim's grandfather and no longer spoke to defendant "because of the incident," was concerned that the call had been pretextual. So, he contacted Smith, who advised the brother not to turn over any money until Smith spoke with defendant. Upon learning that the money request was genuine, Smith told defendant that he would inform defendant's family.

¶ 19    The State asked whether it was "kind of an odd thing" for Smith to visit defendant at the jail. Smith agreed, acknowledging that he did not normally make similar visits to other criminal defendants under similar circumstances.

¶ 20    Next. Thomas Ruzevich, another investigator with the Kane County State's Attorney's office assigned to the Child Advocacy Center, testified that he, along with Smith, interviewed defendant at the North Aurora Police Department on November 10, 2022. Ruzevich generally testified consistently with Smith. Ruzevich took no notes during the interviews.

¶ 21    Ruzevich testified that Smith never yelled at defendant, threatened him, coerced him, or otherwise physically harmed him during either interview. Like Smith, Ruzevich—who is not a

Spanish speaker—testified that defendant spoke English "[t]he entire time" he was interviewed— he had no issues "understanding *** defendant's responses" to any questions. Defendant, in turn, gave no indications that he was having difficulty understanding the interviewers' questions.

¶ 22    On cross-examination, Ruzevich reiterated that, when he spoke with defendant, "he understood the questions [Ruzevich] asked him and repeated them back to [him]." Ruzevich did not recall whether defendant had a Spanish accent. Ruzevich acknowledged that, one day prior to testifying, he had reviewed Smith's report of the interview for the first time. Ruzevich did not aid Smith in creating the report and did not take any notes. Defense counsel asked Ruzevich whether his recollection of defendant's denials and admissions during the interview was based on his "own memory or from the report that *** Smith wrote," Ruzevich answered, "I'm recalling it from the report." When asked whether he had his "own independent memory of [the] interview," Ruzevich stated, "I remember interviewing him. I remember the statements he made. I remember the allegations that were against him and the admissions that he made, yes."

¶ 23    Ruzevich did not recall many details concerning the recording issues at the interview, clarifying that he "was there to assist and it was [his] first week so [he] was more observing." He could not recall precisely when he was made aware of the recording issues in the interview room, and could not recall whether he and Smith had offered defendant a translator.

¶ 24    Following Ruzevich's testimony, the court took judicial notice of a November 11, 2022, bond call order, which indicated that, at that time, defendant appeared in court with the aid of a translator.

¶ 25    The parties then provided their arguments. The State argued that the video footage of the interviews substantially corroborated both officers' testimonies, demonstrating that the alleged confessions were voluntary and reliable. Specifically, according to the State, the recording of the

first two interviews showed defendant with a cup of water, signing a form, and gesturing where he had purportedly touched one of the victims, consistent with both officers' testimonies. The State argued that, based on defendant's body language as depicted in the video, he gave "a voluntary statement," because "there's no abuse, *** there's no taunting, *** there's no threat," and "there's no compulsion to make these statements." The State further argued that, while defendant claimed to have barriers in speaking English, both officers had testified that he had nonetheless expressed himself articulately.

¶ 26    Defendant, by contrast, expressed doubt that the microphone had been inoperable at all, noting that no witness was able to testify that they had personally turned the recording equipment on prior to either interview. Defendant argued that, regardless, the totality of the circumstances showed that his statements were unreliable. For example, defendant pointed out that Smith "took virtually no notes" during the interview, he had inexplicably "destroyed" a second set of notes that may have otherwise been informative, and his accompanying report was written "seven days after the interview," during which time he was busy working on other cases. Further, according to defendant, the report had contradicted aspects of the investigators' testimonies; Smith and Ruzevich had both testified that defendant had initially denied the pertinent allegations, while the report made no mention of these denials.

¶ 27    Furthermore, while some portions of the video footage did corroborate certain aspects of the investigators' testimonies, defendant argued that this was not indicative of the confession's reliability, but rather, a result of how Smith compiled his report:

    "[W]hen [the State] argues that you'll see things in the report like [defendant] standing up or using his arms in some way, it's important to remember that Investigator Smith was watching that while he wrote the report. So of course it's going to match what's in the

video."

Otherwise put, defendant suggested that the video did not verify the report, but rather, the report—which was not corroborated by any other means—was written specifically to conform with the video. Even more, Ruzevich, the only other witness to the interviews, took no part in compiling the report. Similarly, while both investigators' testimonies had conformed with one another, defendant argued that this was not a result of their testimonies' veracity, but rather, a result of both officers reviewing the same report prior to testifying.

¶ 28    Defendant then turned to the issue of his language barriers, which, according to him, "neither officer or either investigator were honest about in the courtroom." According to defendant, Smith had testified that he had not noticed defendant speaking with an accent in the North Aurora interview room, while Ruzevich testified that "he did believe that there may have been a Spanish accent." Still, both officers agreed that defendant spoke fluent English during the November interrogation. However, during the December jail interview, which was conducted after defendant had been charged and without his counsel's knowledge, defendant's recorded language barriers were unmistakable, to the point that Investigator Velasquez suggested they utilize a Spanish interpreter. Defendant argued that both the problematic circumstances surrounding the December interview, as well as defendant's clear, recorded, struggles with the English language, destroyed "Investigator Smith's integrity in this case."

¶ 29    In its rebuttal, the State informed the court that, pursuant to *People v. Harper*, 2013 IL App (4th) 130146, ¶ 18, a trial court in this situation "must determine whether the defendant's statements are voluntary and reliable not, *** whether the recording of the interview is reliable and not whether a police summary of the defendant's statements in a report is reliable." (Emphasis omitted). Thus, the State reasoned, it was immaterial whether Smith's report was "reliable" in

ascertaining the overall veracity of defendant's confession. The State also defended Smith's decision to subsequently interview defendant in jail, suggesting that the decision was driven by his true belief that defendant was "a native English speaker or thought he could do well in English."

¶ 30    The court asked the State, "How can you determine reliability if you don't take into consideration whether [a] statement is true or not?" The State suggested that such an issue was for a jury to determine. The court then asked, "So if someone conducts an interview and the interview is just a cold lie, it wouldn't matter?" Ultimately, the State responded that, under *Harper*, it would be "irrelevant" whether "the interview was a lie" because that was "a trial issue." Instead, according to the State, the trial court's analysis should be limited to the question of whether the confession—as presented by the State—was the product of coercion or undue influence. The court took the matter under advisement.

¶ 31    On December 7, 2023, the trial court granted defendant's motion to suppress. In its decision, the court found that the State had not produced any "evidence of reliability or voluntariness other than a rights form." To this point, the court criticized Smith's credibility, finding that his testimony concerning the December interview was "unexplainable," as a "child safety investigator taking it upon himself to investigate a possible offense being perpetrated on *** [d]efendant makes no sense." On the other hand, certain evidence did otherwise suggest that the confession was neither voluntary nor reliable, such as defendant's clear English barriers. According to the court, "Warning[s] and questions in a language even partially not understandable[] cannot be voluntary or reliable." Thus, the court found that the State had not met its burden in showing defendant's confession was voluntary and reliable, as required for the confession to be admitted.

¶ 32     On January 5, 2024, the State moved for reconsideration of defendant's motion to suppress. On January 10, 2024, the court heard arguments on the motion for reconsideration. After which, the court noted its reasoning in initially granting defendant's motion to suppress:

"[R]eally what I was thinking was I had a very difficult time with the reliability or believability of the witness. And the witness is Smith. The other witness corroborated Smith to a degree, but once it was unrolled a little bit or unpackaged a little bit, you realize that he had no—I think he testified that he had nothing to do with writing the report, he had nothing to do with checking the report, even that was inconsistent whether or not there was some checking of the report. And what bothers me throughout this whole thing is I don't understand what Smith did.

Now, I wasn't thinking about this as being a *Miranda* violation. What really struck me on this is the believability of the witness. The believability of the witness is I had trouble believing him. I had trouble believing it in the facts of how the thing happened at the time. Didn't somebody have a phone? Did anybody check it again the second time to see if it was working? There's these questions that are raised. And maybe those aren't significant.

But then I don't understand the [third] interview at all. I don't understand the point of the [third] interview. I don't understand the explanation that was given by the—by Smith as to why. So if I understood this, it's the [Children's Advocacy Center] investigator who comes out on his own to investigate a possible theft that the defendant would be the victim? It makes—that makes no sense at all to me. None. That someone would—first of all, I don't understand what his jurisdiction would be in that, what would be his—what would be his—his role in investigating a case that has nothing to do with the [Child Advocacy Center]

case, and, in fact, puts him in touch with somebody he had just had an interview on that wasn't recorded. It just—it makes no sense to me at all on that."

Thus, because the court had "credibility issues with the State's witnesses," it found that the State did not sufficiently sustain its burden in showing that defendant's confession was voluntary and reliable. As such, the court denied the State's motion to reconsider.

¶ 33    The State timely appeals.

¶ 34                                II. ANALYSIS

¶ 35    On appeal, the State argues that: (1) the court erred in considering whether any confession had indeed taken place; (2) the trial court's decision included erroneous factual findings; and (3) defendant's statements were voluntary and reliable. We address these arguments in turn.

¶ 36    Section 103-2.1(b) (recording statute) of the Code of Criminal Procedure of 1963 provides that, in certain prosecutions for predatory criminal sexual assault:

> "[A]n oral, written, or sign language statement of an accused made as a result of a custodial interrogation conducted at a police station or other place of detention shall be presumed to be inadmissible as evidence against the accused, unless an electronic recording is made of the custodial interrogation and the recording is substantially accurate and not intentionally altered." 725 ILCS 5/103-2.1(b) (West 2022).

Moreover, subsection (f) of the recording statute provides an exception for confessions that are shown to be voluntary and reliable:

> "The presumption of inadmissibility of a statement made by a suspect at a custodial interrogation at a police station or other place of detention may be overcome by a preponderance of the evidence that the statement was voluntarily given and is reliable, based on the totality of the circumstances." *Id.* § 103-2.1(f).

In considering whether a defendant's statements were voluntary, we consider such factors as the defendant's age, physical condition, or other circumstances affecting the defendant's ability to understand the proceedings and the consequences thereof. *People v. Whitfield*, 2017 IL App (2d) 140878, ¶ 96 (quoting *People v. Slater*, 228 Ill. 2d 137, 160 (2008)). Thus, "the circumstances of the detention and interrogation, including their duration," as well as "the giving of *Miranda* warnings" or "any indications of physical or mental abuse" are directly relevant in determining the voluntariness of a confession. *Id.*

The issue of reliability, which should be "considered separately from voluntariness," "addresses the possibility that a statement that was voluntarily given might nonetheless be unreliable or false." *Whitfield*, 2017 IL App (2d) 140878, ¶ 97. In determining whether a confession is reliable, we consider such factors as the defendant's mental condition, or whether the defendant was deprived of food, water, or sleep. *People v. Harper*, 2013 IL App (4th) 130146, ¶ 22.

> "In reviewing the trial court's determination of voluntariness and reliability, we apply the same standard of review that governs the suppression of evidence in other contexts: 'We review a trial court's factual findings using a manifest-weight-of-the-evidence standard but apply a *de novo* standard of review to the ultimate question of whether the evidence should be suppressed.' " *People v. Whitfield*, 2017 IL App (2d) 140878, ¶ 95 (quoting *People v. Harper*, 2013 IL App (4th) 130146, ¶ 10).

¶ 37                    A. Existence of a Confession

¶ 38    The State first argues that "[t]he trial court erred by considering whether the statements [at issue] were made[,] which exceeds the scope of the People's burden set forth in *** the recording statute." Otherwise put, the State stresses that the trial court was required to assume that a

confession had occurred, regardless of any evidence to the contrary, and that it therefore erred in entertaining the possibility that defendant never confessed his alleged crimes to Smith or Ruzevich. According to the State, only a jury could consider "whether defendant made the[se] statements." As support, the State relies on the Code's provisions on more general motions to suppress confessions for crimes falling outside the scope of the recording statute, which specifies that "[t]he circumstances surrounding the making of the confession may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession." 725 ILCS 5/114-11 (West 2022).

¶ 39    Given the similarities of section 114-11 and the recording statute, the State urges us to adopt a similar approach here, which, in turn, would mean that any questions concerning the existence of an unrecorded or partially unrecorded confession are irrelevant in determining whether the confession is voluntary and reliable. Instead, the State argues that the court could only consider the above-referenced factors concerning reliability and voluntariness referenced in *Harper*.

¶ 40    The State's argument is incorrect, as it counters contrary authority. In *Whitfield*, this court expressly found that any questions concerning the existence of a confession are directly relevant in determining the confession's reliability. There, we noted that most of the caselaw concerning the recording statute pertains to situations where there was at least some recorded audio of a confession and "the defendant admitted making the statement but argued that it should nevertheless be excluded." *Whitfield*, 2017 IL App (2d) 140878, ¶ 99 (citing *People v. Clayton*, 2014 IL App (1st) 130743, ¶ 14 (one of the defendant's two interviews were recorded); *Harper*, 2013 IL App (4th) 130146, ¶ 19 (parties agreed the defendant voluntarily made statements in question); *People v. Harris*, 2012 IL App (1st) 100678, ¶ 17 (only issue was whether the defendant was in custody during interrogation)). We contrasted this caselaw with situations such as this, where no audio at

all exists of a confession, and "the defendant denies making the statements at issue."[2] After doing so, we concluded that "the reliability inquiry in *Harris* and *Harper*," which the State argues is controlling here, "is not a perfect fit for a case such as this, where the existence of the statement itself is challenged." *Whitfield*, 2017 IL App (2d) 140878, ¶ 101. After subsequently discussing how the *Whitfield* confession lacked any corroboration proving its existence, we found that such "facts *** weigh in favor of a conclusion that the State did not meet its burden under the recording statute to show that the presumption against admitting the purported statement was overcome." *Id.* Thus, we expressly concluded that any questions as to a confession's very existence are relevant in determining whether a reliable confession had been made. *Id.* Indeed, common sense leads us to this conclusion, as there cannot be a *reliable confession* without there first being a *confession*. Accordingly, we reject the State's first argument.[3]

¶ 41                             B. Erroneous Factual Findings

---

[2] The State argues that defendant never argued in his motion to suppress that defendant never actually made a confession. However, during the hearing on the motion, defendant clearly argued that defendant's language barriers precluded him being able to make a voluntary, reliable confession. Regardless, in deciding defendant's motion, the court was tasked with considering "the totality of the circumstances surrounding the statement," which would necessarily involve defendant's clear language barriers. *People v. Slater*, 228 Ill. 2d 137, 160 (2008).

[3] Additionally, the State's argument is undercut by its own admission that "the circuit court did not make an express finding as to whether the inculpatory statements attributed to defendant occurred." If the court never made a finding as to whether the statements occurred, it is unclear how the court could have relied on this non-existent finding to the detriment of the State.

¶ 42    Next, the State argues that we should reject certain "findings of fact that are manifestly erroneous," such as the court's findings that: (1) the malfunctioning microphone was replaced in between the first two interviews, when it was actually replaced days thereafter; (2) Smith had destroyed a "report," when instead, he had destroyed a second set of notes prior to documenting the relevant interviews; (3) both Smith and Ruzevich had testified that defendant spoke "perfect" English, when in fact, Smith had only made this comment while interviewing defendant in jail; (4) defendant's brother was a complaining witness in the underlying action, when he was actually the grandfather of the victims; (5) defendant spoke Spanish during the jail interview.

¶ 43    We are somewhat at a loss as to what the State's purpose is in bringing these inaccuracies to our attention, as it does not argue that any of these imprecisions had any import in the circuit court's decision. Thus, even if the State meant to argue that these inaccuracies rendered the court's decision erroneous, it has provided us with no argument leading to such a conclusion, meaning the argument would be forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In either event, we have noted the inaccuracies noted by the State—which do not have any bearing on our ultimate outcome—and continue to its remaining arguments.

¶ 44                    C. Voluntariness and Reliability

¶ 45    Finally, the State argues that it satisfied its burden in showing that defendant's alleged confession was voluntary and reliable, and that, as a result, the trial court's findings to the contrary were against the manifest weight of the evidence. Specifically, the State argues that a review of the: (1) defendant's age, intelligence, education, experience, and physical condition at the time of the interrogation; (2) duration of the interrogation; (3) presence of a *Miranda* warning; (4) the lack of any abuse; and (5) the legality of defendant's detention all show that defendant's alleged statements were voluntary. Similarly, the State further argues that the reliability of the alleged

confession can be demonstrated by the lack of any coerciveness demonstrated in the interview videos. Furthermore, the State contends that the first two interview videos corroborate many details of Smith's report and the investigators' testimonies, such as: (1) the number and duration of the instant interviews; (2) the fact defendant was given a bathroom break; and (3) certain gestures defendant made. Also, Smith's and Ruzevich's testimonies corroborated each other.

¶ 46    We disagree. Despite all the points the State raises concerning the voluntariness and reliability of the confession, it trivializes the import of defendant's language barriers. Again, in its decision, the court noted that "[t]he language issue is also of concern." It went on to explain how, in its view of the record, "[d]efendant had some difficulty with the English language," and that "[w]arnings and questions in a language even partially not understandable, cannot be voluntary or reliable." While the State does not deny that language barriers could preclude a confession from being voluntary and reliable, it does argue that defendant did not face any language barriers that would render his confession inadmissible. However, the court's findings as to this point were not against the manifest weight of the evidence. In rendering its decision, the court was able to take judicial notice of defendant's use of an interpreter, which had been assigned to him prior to defendant filing his motion to suppress. The audio from the December 2022 jail interview, which we have reviewed, made clear that defendant was not fluent in English, contrary to the testimony of Smith and Ruzevich. Indeed, moments after beginning the interview, Investigator Velasquez, upon hearing defendant speak, quickly suggests that the investigators employ an interpreter to facilitate the interview. Indeed, the State did not call any other witnesses from the jail or otherwise, aside from the investigators, to testify that defendant had no language barriers. This evidence seriously undermined their insistence that defendant was fluent in English and supports the trial court's determination regarding their credibility.

¶ 47    The State suggests that, notwithstanding the language barrier, defendant forfeited any contention regarding his fluency because it was not included in the written motion to suppress. We disagree. Once more, it was not defendant's burden to show that the confession was inadmissible, as the parties agreed that no audio recording of the confession existed. For this reason, it was the State's burden to show by a preponderance of the evidence that the confession was voluntary and reliable. *Id.* § 103-2.1(f) (West 2022). Thus, regardless of the specific arguments made in defendant's written motion, the State needed to show that defendant was able to understand and appreciate the questions asked of him so that he could voluntarily provide the investigators with reliable responses. *Id.*; *Whitfield*, 2017 IL App (2d) 140878, ¶¶ 96-97. Indeed, in deciding defendant's motion to suppress, the court was tasked with examining *all attending circumstances* surrounding the alleged confessions, which would naturally include any evidence of defendant's ability to understand English. *Slater*, 228 Ill. 2d at 160. Clearly, the issue of defendant's language barriers was directly relevant to the question of the confession's reliability and voluntariness, as a party cannot give voluntary answers to questions it does not appreciate, nor can one give reliable answers in a language he or she does not understand. See *Whitfield*, 2017 IL App (2d) 140878 (2017), ¶¶ 96-97 (voluntariness requires an appreciation of the surrounding proceedings while reliability involves a determination that statements can be taken as true).

¶ 48    Either way, the record makes clear that, while arguing his motion to suppress, defendant repeatedly discussed his language barriers. Accordingly, the issue *was* presented to the trial court prior to a decision being rendered, and we disagree with the suggestion that it should otherwise be forfeited.

¶ 49    The State also unpersuasively attempts to downplay evidence of defendant's language struggles, contending that "the circuit court's finding that there was a language barrier makes little

sense given the circumstances of the case." While the State argues that the recorded depictions of defendant signing the *Miranda* form evidences his ability to understand English, the record shows that the form also included Spanish versions, which could easily explain why defendant signed it. While the State argues that both investigators testified that defendant spoke fluent English, the court's finding as to the contrary was not against the manifest weight of the evidence, as their testimony was rendered incredible by the audio capturing the December 2022 jail interview. Furthermore, as the court explained in its decision, several questionable aspects of the investigators' testimonies additionally diminished their credibility. For instance, the court questioned why Smith would not have recorded the second interview with his cell phone, when he had knowledge that the interview room experienced difficulties in recording the first interview. As another example, the questionable circumstances surrounding the December 2022 jail interview diminished Smith's credibility. To this point, the court expressed confusion as to why Smith, an investigator for the Children's Advocacy Center, would insert himself into a dispute concerning a jail's commissary, after defendant had already been charged in the instant case. Smith was also successfully impeached concerning the time it took him to generate the report, despite the fact that he had reviewed the dated report prior to testifying. While these facts do not necessarily show any wrongdoing on Smith's behalf, they nonetheless support the court's credibility finding, which must be afforded great deference. *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 67.

¶ 50    The State also remarkably argues that the December 2022 audio actually reinforces a finding that defendant was fluent in English. This argument strains credulity. During this final interview, defendant was only able to respond to the investigators with broken strings of English, which prompted Investigator Velasquez to—almost immediately—suggest the investigators utilize an interpreter, just as defendant had been using for the pendency of these proceedings. Although

it is true that defendant did not *actually* speak any Spanish during this interview—a fact the State repeatedly drills home—defendant struggled very much in responding in English, and many of his answers were nonsensical and demonstrated a clear misunderstanding of the questions being posed to him. Accordingly, given the relatively large amount of evidence exemplifying defendant's language barriers, it was not against the manifest weight of the evidence for the court to conclude that defendant's alleged confession was not reliable and voluntary.[4]

¶ 51    The State argues that, in its motion to reconsider, it requested the circuit court to reopen the proofs on the limited issue of defendant's language barriers. Because the court denied the request, the State now requests that we order the circuit court to reopen the proofs. However, the State failed to argue that the trial court's refusal to open the proofs was erroneous, thereby forfeiting the contention. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 52    As a last effort, the State argues that we must reject the circuit court's findings as to the alleged confession's lack of reliability and voluntariness, as it "erred by imposing a corroboration requirement." To this point, the State cites a statement from the court's decision, in which the court

---

[4] The State cursorily argues that the trial court's "entire analysis misapplied the law," as it found that, "without any audio, it is impossible to determine if *** Defendant's statements are voluntary or reliable," rendering the voluntariness and reliability exception outlined in subsection (f) of the recording statute "entirely meaningless." The State distorts the circuit court's analysis, which referenced the specifics of this case, and not the recording statute in general. The circuit court noted that, here, where the State failed to provide any meaningful evidence of the alleged confession's voluntariness or reliability, it was unable to ascertain as much from the silent video feed alone.

found, pursuant to *People v. Bowel*, 111 Ill. 2d 58 (1986) and *Chambers v. Mississippi*, 410 U.S. 284 (1973), that "the most significant confessions should be corroborated, if possible." The State argues that the court therefore erroneously required any evidence of reliability and voluntariness to be corroborated, because the recording statute does not provide for such a requirement.

¶ 53    The State, once again, misconstrues the circuit court's decision. While the court did note that corroboration serves as the most "significant indicator of the reliability of confessions," nowhere in its decision did it find that there *must* be corroboration in order for a confession to be admissible. Indeed, later in its decision, the court explicitly stated that reliability only requires "the [confession] to be free from coercion" and, "*if possible*," to be corroborated. (Emphasis added.) Thus, the court's language left open the possibility that evidence of reliability need not necessarily be corroborated, and the State's argument is factually incorrect.

¶ 54    We note that, despite all the State's arguments as to the specific mechanisms underlying the court's decision, this is a relatively simple case that can be distilled to the following: It was the State's burden to prove that defendant's alleged confessions were voluntarily and reliable. The trial court found that the State presented insufficient evidence as to these points, so it failed to meet this burden. Based on all of the above, we find that the circuit court's findings as to the reliability and voluntariness of the confession were not against the manifest weight of the evidence. Accordingly, it was not error for the court to grant defendant's motion to suppress.

¶ 55                                    III. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the trial court's order granting defendant's motion to suppress his statements.

¶ 57    Affirmed.